JUDGE BULLITT
delivbbkd THU opinion op the codkt:
In September, 1802, the appellee, Rebecca Doniphan, by her attorney, filed a petition seeking to recover from the appellant .$5,000 due upon his note to her, executed in the year 1860.
The appellant filed an answer, alleging that when the present rebellion commenced, the said Rebecca resided in the State of Missouri, and became a secessionist, and actually joined the confederate government, and moved to the State of *387 Arkansas, where she could better have the protection thereof, and where she has continued to this time to assist and give aid and comfort to the rebellion by her means and money ; that, on the 22d day of July, 1862, the President of the United States issued his proclamation, as required by the 6th section of the act of Congress, approved July 17, 1862, and entitled “an act ~to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes and that the said Rebecca has not returned to her allegiance to the United States, but still remains in Arkansas, assisting the rebellion, and giving aid and comfort to the rebels, by giving to them money to carry on the said rebellion; and he pleaded the act of Congress in bar, and prayed that the petition might be dismissed.
A demurrer to the answer was sustained, and a judgment rendered against the defendant, to reverse which he prosecutes this appeal.
The above mentioned act of Congress declares that any person, who shall commit treason, shall be punished by death and by the liberation of his slaves, or by fine ^and imprisonment and the liberation of his slaves; and that any person, who shall incite or engage in any rebellion or insurrection, or give aid and comfort thereto, shall be punished by imprisonment, or by a fine and the liberation of his slaves, or by both of said punishments, at the discretion of the court; and then, after di~ récting the President to seize all the property of certain officers, civil and military, of “the so-called Confederate States of America,” and of certain other persons therein mentioned, and to use the same and the proceeds thereof for the support of the army of the United States, declares as follows:
“§ 6. And be it further enacted, That if any person within any State or Territory of the United States, other than those named as aforesaid, after the passage of this act, being engaged-in armed rebellion against the government of the United States, or aiding or abetting such rebellion, shall.not, within sixty days after public warning and-proclamation duty given and made by the President of-the United States, cease to aid, countenance and abet such rebellion, and return to his a'llegi- *388 anee to the United States, all the estate and property, money, stocks and credits of such person shall be liable to seizure as aforesaid; and it shall be the duty of the President to seize and use them as aforesaid, or the proceeds thereof; and all sales, transfers or conveyances of any such property, after the expiration of the said sixty days from the date of such warning and proclamation, shall be null and void; and it shall be.a sufficient bar to any suit brought by such person for the possession or the use of such property or any of it, to allege and prove that he is one of the persons described in this section.”
The 7th section authorizes proceedings in rem, in the district courts of the United States, to be instituted in any district in which the property or any part thereof may be found, or into which the same, if movable, may first be brought, which shall conform as nearly as may be to proceedings in admiralty or revenue cases, “to secure the condemnation and sale of any of such property, after the same shall have been seized, so that it may be made available for the purposes aforesaid.”
By a joint resolution adopted July 17, 1862, it was declared that no “punishment or proceedings under said act shall be construed to work a forfeiture of the real estate of the offender beyond his natural life.”
The act does not authorize the State courts to condemn such property. It can only be condemned by the district courts of the United States. The only provision of the act that can possibly be regarded as designed to control the action of the State courts, with reference to the proceedings which it authorizes, is that which declares that “it shall be a sufficient bar to any suit brought by such person for the possession or tfie use of such property, or any of it, to allege and prove that he is one of the persons described in this section.”
Does this provision apply to suits for the recovery of debts? The 6th section declares that “all the estate and property, moneys, stocks and credits” of the persons therein described shall be seized, &c.; and that all sales, transfers or conveyances “of any such property” shall be void, and that it shall be a sufficient bar to any suit for the possession or use “of *389 any such property,” to allege, &c.; and the 7th section authorizes the proceedings before mentioned to secure the condemnation and sale “of any of such property.” It seems clear that the words “such property” were designed to embrace all the property first mentioned, namely: “All the estate and property, moneys, stocks and credits” of the persons described in the act.
But does the provision concerning pleas in bar relate to the State courts? If it does, and is valid, a State court may render a judgment in bar of an action, upon the ground that the plaintiff is a rebel; and the district court, having jurisdiction over the subject, may afterward refuse to confiscate the property, upon the ground that he is not a rebel.
It seems unreasonable to suppose that Congress intended to make a rule capable of producing such a result. But it seems equally extraordinary that Congress should have contemplated other results, of a similar character, that were evidently aimed at by the act in question; which undertakes to authorize the seizure by the President and condemnation by a district judge, of the property of any citizen whom* those officers may consider guilty of either of the offenses mentioned in the act, without a trial by jury, or upon a trial by jury in any district in which any of the property may-be founci, or into which, if movable, it may first be brought; whilst, by the same act, for the same offense, the same citizen is made amenable to a criminal prosecution, which, after his property has been confiscated, and the proceeds expended by the President, may result in his acquittal by a jury in the State and district in which the offense may be alleged to have been committed.
The provision prohibiting the rendition of judgments in favor of persons described in the act, was evidently made chiefly for the purpose of facilitating the seizure and confiscation of their property by the agents and courts of the United States. The State courts, by rendering judgments in favor of such persons, might seriously impede the efforts of those agents and courts to seize and confiscate such property. In view of these facts, and of the comprehensive language of the provision, *390 our opinion is, that it was designed to apply to suits in the State as well as the Federal courts.
Although Congress could not have required the State courts to take jurisdiction over proceedings for the confiscation of such property, if it had attempted to do so, yet it ought perhaps to be conceded, and will be conceded for the purposes of this case, that, if Congress has the power to authorize the seizure and confiscation of the property of the rebels in the manner contemplated by this act, it has also the incidental power to prohibit the recovery ol' such property, by such persons, in the State courts. But, on the other hand, if the provisions of the act, concerning the seizure and confiscation of such property, are unconstitutional and void, leaving the rights of the owners unimpaired and indefeasible, it seems clear that Congress has no power to prohibit the State courts from giving to them the relief to which they are entitled under the laws of the States.
Thus the question árises, whether the provisions of the act, authorizing the seizure and confiscation of the property of rebels, are valid, or unconstitutional and void.
The cases in which it has been held, that property with which the owner has attempted to violate a blockade, or revenue laws, may be forfeited by a proceeding in rem, without a conviction of the owner, have no bearing on this question. Those cases rest upon the ground, that “the thing is primarily the offender, or rather the offense is primarily attached to the thing.” (Per Story, Justice, in The Palmyra, 12 Wheaton, 14.) But the forfeitures, or confiscations, contemplated by the statute under consideration, are to be effected, not on account of any use of the property by its owner, but on account of offenses which the owner may commit without reference to his property.
Counsel seek to sustain the power of Congress thus to punish rebels, upon several grounds :
1. It is contended that this power can be exercised under that clause of the constitution which authorizes Congress “to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water.” That clause, *391 however, has no bearing on this question, because it relates only to wars with foreign nations, as was recently decided by the Supreme court of the United States, in the cases of The Brilliant etc. vs. United States, (reported in the Law Register, April, 1863.)
2. It is contended, that the right to confiscate the property of rebels is conferred on the government of the United States by the law of nations.
The usage of nations, if applicable to the case, does not sustain this effort to confiscate property here belonging to rebels, and debts owing to them, before the commencement of hostilities; for it is settled that the modern usage of nations does not sanction such confiscation of the property of even alien-enemies (Bell vs. Chapman, 10 John., 183 ; Hutchinson vs. Brock, 11 Mass., 119; Brown vs. United States, 8 Cranch, 110; 1 Kent's Com., 92.)
It must be conceded, however, that the courts of a sovereign, engaged in war, cannot compel him to observe the usage of .nations, nor treat as void any act of his because it violates that usage. The law of nations has no obligatory force upon him in dealing with his subjects. He may disregard it, and establish a different rule; and if he does so, those within his jurisdiction must observe the rule so established, however it may conflict with the usage of nations. In the absence of any positive law to the contrary, the usage of nations may furnish a rule for the guidance of courts of justice; but they cannot be governed by it in the presence of a positive conflicting law made by a sovereign who may choose to disregard it. This is all that Chief Justice Marshall meant when he spoke of “the modern usage of nations which has become law.” (United States vs. Percheman, 7 Peters, 86,) as is shown by his opinion in the case of Brown vs. United States, (8 Cranch, 110,) in which he used this language :
■ “This usage [of nations] is a guide which the sovereign follows or abandons at his will. The rule, like other rules of morality, of humanity, and even of wisdom, is addressed to the judgment of the sovereign ; and although it cannot be disregarded by him without obloquy, yet it may be disregarde . *392 * * * Respecting the power of the government [to confiscate the property of alien enemies on land] no doubt is enter-táined. That [public] war gives to the sovereign full right to take the persons and confiscate the property of the enemy wherever found, is conceded. The mitigations of this rigid rule, which the humane and wise policy of modern times has introduced into practice, will more or less affect the exercise of this right, but cannot impair the right itself. That remains undiminished, and when the sovereign authority shall choose to bring it into operation, the judicial department must give effect to its will. But until that will shall be expressed no power of condemnation can exist in the court.”
It seems, therefore, that the act of a sovereign, exercising belligerent rights against a separate nation, however grossly it may violate the usage of nations, gives the law by which, at least, all courts and persons within his jurisdiction must be governed. And, as the existence of a public war gives to Congress the power, as a belligerent right, to confiscate enemy’s property on land, though such is not the usage of nations, it follows that Congress possesses the power to pass the act under consideration, if the existence of civil war gives to the government all the belligerent rights against its rebellious citizens, which it possesses against alien enemies during a public war.
The constitution of the United States declares that the President “shall take care that the laws be faithfully executed,” and that Congress shall have power “to provide for calling forth the militia to execute the laws of the union, suppress insurrections and repel invasions.” It will be conceded, for the purposes of this case, not only that these provisions authorize the government to make war for the suppression of an insurrection, which takes the shape of war, as the present one has done, but that the army and navy may lawfully prosecute the war as if it were a war with alien enemies, and according to the usages of public wars. Does it necessarily follow that the rebels may lawfully be treated as alien enemies by all the departments of the government? We believe .not.
*393 The right, given by the constitution,,to make war upon rebels; gives the power to perform acts of war, and gives no other power whatever.
Civil wars being, in many respects, of the same nature as public wars, the right to treat armed rebels, in many respects, as if they were alien enemies, necessarily results from the power to make war upon them.
The facts, that prisoners are exchanged, that flags of truce are respected by the opposing forces, that armed rebels may be lawfully slain in battle, that their arms, ammunition and stores may be lawfully taken and used or destroyed, that articles, contraband of war, being sent to them, may be lawfully confiscated, that their ports may be lawfully blockaded, and that their property on the high seas may be lawfully seized as prize of war; these facts prove that civil wars are, in many respects, the same as wars between separate nations; and they prove nothing more. These being acts of war, the right to perform them necessarily results from the power to make war.
But the fact that the army may fight rebels, as if they were alien enemies, does not prove that Congress can legislate against them as if they were alien enemies.
The courts have as much right to treat them as alien enemies by refusing to try them for treason, as Congress has to treat them as alien enemies, by confiscating their property.
Circumstances may arise which would authorize the army to destroy the dvrelling-house of a rebel. Can Congress, for that reason, confiscate all the dwelling-houses of rebels? If so, it can, for the same reason, confiscate the dwelling-houses of friendly citizens, in States adhering to the union; for the army may destroy the latter, as well as the. former, to save itself from destruction.
In the case of The Amy Warwick, in the United States district court, for the district of Massachusetts, Judge Sprague, after stating, that “in war, each belligerent may seize and confiscate all the property of the enemy wherever found,” and that “ this right extends^to the property of all persons residing in the enemy’s country,” expressed the opinion, that, *394 in this civil war, “the United States, as a nation, have full and complete belligerent rights, which are in no degree impaired by the fact that their enemies owe allegiance, and have superad-ded the guilt of treason to that of an unjust war.” We are not prepared to admit that Congress has the power to confiscate the property of persons residing in the rebellious States, who have given no aid to the rebellion, or who have given it no aid except upon compulsion, and who have given all the aid they could to the government of the United States, whilst receiving from it none of the protection to which they were entitled. The conclusion arrived at by Judge Sprague, if correct, proves that Congress has the power to confiscate the property of such persons. And we do not perceive how that conclusion can be avoided, if the law of nations governs this controversy, or if, in other words, the government of the United States possesses, in this contest, all the rights of a belligerent engaged in a public war.
If the law of nations governs the relations of the parties to this contest, it gives to each of them precisely the same rights. If it gives to the Federal government the right,'as a belligerent, to confiscate real estate, and personal property on land, belonging to rebels, it gtves to the confederate government the right, as a belligerent, to confiscate like property of citizens adhering to the Federal government; and confiscation sales, made by the confederate authorities, would pass valid titles, which could not be annulled by the courts of the United States, after the suppression of the rebellion. This is unquestionable, if the relations of the parties to this contest are governed by the law of nations.
But, to meet this difficulty, it is contended that the rebels are, in legal contemplation, and may lawfully be treated, as, at the same time, alien enemies and rebellious citizens; and that the government has against them, at one and the same time, all the rights conferred upon it by the constitution over citizens of the United States, and all the rights conferred by the. law of nations upon a belligerent engaged in a public war.
This, in our opinion, cannot be, because the law of nations and the constitution of the United States are, in many respects, inconsistent with each other. Their co-existence and co-oper *395 ation are, therefore, in many respects impossible, and would produce irreconcilable conflicts between different departments of the government. For instance, undqr the law oí nations it is the right and duty of the army to treat rebels taken in arms as prisoners of war; but under the constitution it is the right and duty of the courts to treat them as traitors. We do not perceive how that conflict can be avoided, except by holding that the constiution, alone, governs the relations between the parties to this feontest; that it governs the army, as well as the President, the Congress, and the courts,- with reference to the conduct of the war; and that it gives to the army, as an incident inseparable from the power to prosecute the war, the same right to treat rebels, taken in arms, as prisoners of war, which it gives to the courts, under other circumstances, to treat them as traitors.
It. has been said that, during a civil war, the sovereign may exercise both belligerent and sovereign rights. (Per Ch. Justice Marshall, in Rose vs. Himely, 4 Cranch, 272; The Brilliant, etc. vs. United States, supra ) This cannot be doubted, but it does not prove that the sovei’eign may treat those in ' rebellion both as alien enemies and as rebellious subjects; nor is anything to that effect contained in either of those cases. On the contrary ,Jn the last mentioned case, it was declared that all persons residing within the Confederate States, “whose property may be used to increase the revenues of the hostile power, are, in this contest, liable to be treated as enemies, though not foreigners
- Unquestionably the usagemf nations, in the conduct of public wars, may be considered for the purpose of ascertaining what are the rules of civil war, and what is the meaning of those provisions of the constitution which authorize the government to prosecute such a war-; just as the common law, though the constitution does not make it the law of the government of the United States, may be considered for the puf-pose of ascertaining the meaning of several provisions of the constitution. And, though the law of nations does not govern the relations existing between the parties to this war, it of course governs their several and mutual relations to other na *396 tions. It governs our intercourse with foreign nations, as it has hitherto done, and must be considered by us, as it is by them, in determining questions of blockade, and of prize, and other questions touching our foreign relations. Such were the questions involved in the cases of The Brilliant, etc. vs. United States, supra.
In our opinion, the law of nations can have no other application to this contest. But if we err in that opinion, it does not follow that this government can exercise all the powers conceded to belligerents by that law. What we have stated, and the language which we cited from Chief Justice Marshall’s opinion in the case of Brown vs. United States, concerning the powers of a belligerent sovereign, relate to unlimited sover-eignties. The law of nations cannot convert a limited into an unlimited sovereignty. It cannot be substituted for the constitution of the United States in war any more than in peace. The constitution was designed to be perpetual, and neither the President nor the Congress has power to suspend it, in war or in peace. Even if the law of nations applies to this contest, it cannot confer upon the government any power, the exercise of which is prohibited by thp constitution, or which is inconsistent with the nature of the government established thereby. The law of nations concedes to a sovereign, who has closed a war by conquest, the right to establish any form of government that he may choose over the conquered nation. Consistently with that law he may completely change their municipal laws and political regulations; he may convert a free commonwealth into a dependent province, and govern it despotically. Why may not similar powers be exercised by this government over the people of the Southern States? If it can deprive them of their rights of property, in the manner proposed by the act under consideration, why may it not, by a sweeping act of outlawry, deprive them of the right of suffrage, and of all other of their rights as citizens of the Union and of the States in which they reside? If it may adopt any policy it pleases for the purpose, or the avowed purpose, of subduing them, why may it not adopt any policy it may please for the purpose, or the avowed purpose, of holding them in *397 subjection afte: subduing them? Yet it seemo clear, that such powers cannot be lawfully exercised over them if the rebellion should be subdued, because they are inconsistent with the nature of the government, and the exercise of them is prohibited by the constitution, which declares that “the United States shall guarantee to each State in this Union a republican form of government,” and which contains many other provisions that are entirely incompatible with the exercise of the powers in question.
If -Congress had the power to enact this statute, it can adopt such measures as may be necessary to carry it into effect. It is probable that, in order to carry its provisions into effect, it will be necessary not only to defeat and disperse the Southern armies in the field, but to subjugate the people of the Southern States, and to hold them in a condition of permanent subjection to the government of a nominal Union, to be controlled by the people of the other States, unless they also should lose their liberties in an effort to subjugatev others. It seems certain that the framers of the constitution did not mean to clothe Congress with the power thus to destroy the government.
The facts, that the constitution declares, that “treason against the United States sh’alf consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort;” that it prescribes the mode of trying citizens charged with levying war against the United States, and the place of trial, and that it limits the punishment of them, proves that its framers did not contemplate a suspension of its provisions by civil war, nor a denial to. traitors of its guaranties, nor the exercise over them of powers which it does not confer.
The right of a sovereign to establish courts of prize in a conquered country is conceded by the law-of nations. Butitwas decided by the Supreme Court of the United States that, during the war between the United States and Mexico, neither the President nor any inferior executive officer could establish a court of prize in territory conquered from Mexico. The court said: *398 under whose authority they are made; and the validity of the seizure and the question of prize or no prize can be determined in his own courts only, upon which he has conferred jurisdiction to try the question. And, under the consitution of the United States, the judicial power of the general government is vested in one supreme court arid in such inferior courts as Congress shall from time to time establish. Every court of the United States must, therefore, derive its jurisdiction and judicial authority from the constitution or laws of the United States; and neither the President nor any military officer can establish a court in a conquered country, and authorize it to decide upon the rights of the United States, or of individuals, in prize cases, nor to administer the law of nations.” (Juker vs. Montgomery, 13 Howard, 515.)
*397 “All captures jure belli are for the benefit of the sovereign
*398 That case proves that the powers of each department of the government of the United States are limited by the constitution, even during a war with a foreign nation, and within its territory. It is clear, therefore, that no department of the government can relieve itself from the restraints of the constitution within the territory of the United States, and in a war with its citizens.
It seems equally clear, that the constitution does not authorize the confiscation of the property oí a rebel, because of his crime, without a trial by jury of the offender and his conviction “by due process of law,” {5th amendment,) unless the power can be derived from those provisions of the constitution which authorize the government to suppress insurrections. Whether or, not the power can be thus derived depends upon the question whether or not such confiscation is an act of war.
The right of the government of the United States, during either a public or civil war, to confiscate enemy’s property taken upon the high seas is not denied. This is an act which is made lawful by the declaration or existence of war, and need not be authorized by Congress. The seizure, in such •cases, is a purely military act, and its sanction, by a judicial condemnation of the property, does not deprive it of that character, but justifies it, as such, to foreign nations, whose citizens may hate an interest in the property.
*399 But the seizure and confiscation of enemy’s property on land, which is not contraband of war, are not acts of war. If they were, they could be performed by the army, orbe made lawful by an order of the commander-in-chief, without other authority than that conferred by the declaration or existence of war. It has been decided, however, by the Supveme Court of the United States, that the declaration and existence of war between the United States and Great Britain did not authorize the confiscation of enemy’s property on land, and that it could not be confiscated except by virtue of an act of Congress. (Brown vs. United States, supra.) That decision proves that the seizure and confiscation of enemy’s property on land are not acts of war.
In that case it was conceded that, in a public war, such right of confiscation belongs to Congress, as a belligerent right; and we are not disposed to question the correctness oi that concession. But it does not follow that Congress has the same belligerent right against rebellious citizens of the United States. The restrictions in the constitution upon the powers of the government were designed to protect the people of the United States, and not aliens resident abroad. The protection received by aliens, residing abroad, with reference to their property here, is due to international comity, and not to the constitution of the United States. War may authorize the government to refuse comity to its enemies, but cannot authorize it to suspend the constitution, by virtue of which alone it has a right to exist. And, moreover, as has been sh <wn, the constitution contains a provision authorizing Congress “to make rules concerning captures on land and water,” during public wars, which does not apply to civil wars. In our opinion, the existence of civil war does not confer' upon this government any belligerent right whatever, except the right to perform acts of war for the suppression of the rebellion. We have shown, at any rate, that the law of nations concedes to belligerents many powers which cannot.be exercised by this government, and that it cannot exercise any of those powers which are in conflict with the constitution.
Though the constitution declares that, “no person shall be *400 deprived of life, liberty, or property, without due process of law,” yet a rebel may lawfully be slain in battle and thus be deprived of life, or he may lawfully be captured in battle and thus be deprived of liberty; because these, being acts of war, are authorized by those other provisions of the constitution which authorize the prosecution of the war. But those provisions do not authorize the confiscation of his property in the manner proposed by the statute under consideration, because such confiscation is not an act of war. JNor is such confiscation authorized by any other provision of the constitution. On the contrary, it is prohibited.
The 5th amendment, declaring that “no person shall be deprived of life, liberty, or property without due process of law nor shall private property be taken for public use without just' compensation,” prohibits the confiscation or forfeiture of the property of any citizen of the United States, unless it can be sustained as a purely military act, which, as has been shown, cannot be done with reference to the property aimed at by the statute under consideration, or unless it can be sustained as a punishment for treason, or other crime, the punishment of which Congress is authorized to prescribe.
The confiscation aimed at by the statute under consideration cannot be sustained as a punishment for treason, because the statute undertakes to authorize the condemnation of the property by a district court, in any district in which any of the property may be found, or into which, if movable, it may first be brought, without presentment or indictment by a grand jury, without the arrest or summons of the owner, and upon such evidence of his guilt as would be sufficient proof of any fact in admiralty or revenue cases; whilst the constitution declares that “no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia when in actual service, in time of war or public danger; (5th amendment;') that the tidal of all crimes, except in cases of impeachment, shall be by jury, and shall be held in the State where the said crime shall have been committed; (art. 3, sec. 2, sub, 3;) and shall be by an impartial jury of the *401 State and district wherein the said crime shall have been committed, and that the accused shall enjoy the right to be confronted with the witnesses against him; (6th amendment;) and that no person shall be convicted of treason unless on the testimony of two witnesses to the same overt act, or on confession ih open court. (Art. 3, sec. 3, &ub. 1.) And these provisions, except the last one, render it equally clear that this attempt at-confiscation, or rather at forfeiture, cannot be sustained as a punishment for any crime less than treason.
If, therefore-, the act should be regarded, as we believe it must-be, as an attempt to punish citizens for treason, or for aiding or abetting the rebellion, it is -unconstitutional and void, because it authorizes a trial of those crimes in a mode different from that required by the constitution.
If it should be regarded as an attempt, not to punish those citizens for crime, but to support the army of the United States with the proceeds of their property,-it is unconstitutional an,d void, because it makes no provision for compensation. The constitution does not recognize military necessity, nor any other necessity whatever, as an authority for “taking private property for public use,” in peace or in war, without just compensation.
Whether or not the provisions of the act concerning the confiscation of personal property are in conflict with that clause of the constitution, which declares that “no attainder of treason shall work corruption of blood or forfeiture, except during the life of the person attainted,” is a question upon which a majority of the court deem it unnecessary to express an opinion. Upon this point Judge Williams dissents, and proposes to write his own separate opinion.
3. It remains to be determined whether or not, upon common law principles, the appellee can, during the war, maintain an action for the money claimed in her petition.
This question is entirely distinct from that relating to the-right of confiscation, and depends, as we have j ust intimated, not upon the constitution, nor upon the law of nations, but upon the common law. The fact, that the government is not authorized by the constitution to confiscate the debt, does not *402 prove that the appellee is entitled, by the common law, to recover the money, during the war, and take it to Arkansas, where it may be used against the government.
By the common law. though war does not create a forfeiture of the rights of alien enemies, growing out of pre-existing contracts, it is settled that the right of action of an alien enemy, residing in the enemy’s country, is suspended by war during its continuance.
It is from reasons of national policy that the alien is prevented from recovering the money and carrying it out of the country during the war. (Levine vs. Taylor, 11 Mass. R., 12; Russell vs. Skipwith, 6 Binney, 249.)
As we have remarked, this insurrection has taken the shape of war. Those engaged in it have established a de facto government, complete in all its parts, and exercising sovereign powers over an extensive territory. “It is no loose, unorganized insurrection, having no defined boundary or possession. It has a boundary marked by lines of bayonets, and which can be crossed only by force. South of this line is enemy’s territory, because it is claimed and held in possession by an organized, hostile, and belligerent power. All persons residing within this territory, whose property may be used to increase the revenues of the hostile power, are in this contest liable to be treated as enemies, though not foreigners.” (The Brilliant, etc. vs. United States.)
Whether or not merely residing in that territory would render a person liable to be treated as an enemy, is a question upon which we need not express an opinion.
We are satisfied that, if the statements of the answer are true, those principles of the common law, which suspend an a,lien enemy’s right of action during war, apply to this case, and forbid our courts from aiding the appellee to recover money which might be used by her to support the war against the United States.
The Code of Practice does not authorize a plea in abatement. But one of the grounds of defense that may be pre-seated in the answer is, “that the plaintiff has not legal capa *403 city to sue.” If the facts stated in the answer are true, the petition should be dismissed without prejudice.
The judgment is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.
JUDGE WILLIAMS
delivered his separate opinion, as follows:
In 1862 Rebecca Doniphan sued Norris on his note for $5,000, then due.
■ Norris, for defense, alleged that the plaintiff was a resident of Missouri when the present rebellion broke out; that she became a secessionist, and, actually joined the Confederate States government, moved to the State of Arkansas, where she could better have the protection thereof, and where she has continued to this time, to assist and give aid and comfort to the rebellion by her means and money; that, on the 22d day of July, 1862, the President of the United States issued his proclamation, as authorized by section 6, of the act of Congress, approved July 17,1862, and entitled, “An act to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes;” and that said Rebecca has not returned to her allegiance to the United States, but still remains in Arkansas, assisting the rebellion, and giving aid and comfort to the rebels, by giving to them money to carry on said rebellion; and he pleads the aforesaid act of Congress in bar.
A demurrer was sustained to this answer, and judgment' rendered for plaintiff, of which appellant complains and asks a reversal.
The said section of said act authorizes these facts' to be plead in bar in any suit; and, if said act of Congress is constitutional and obligatory as law, the courts in all the loyal States should administer it as part of the laws of' the land, and for the purpose of withholding from the rebels the means sought to be recovered, and to enable the United States, through its courts, to recover the same. Therefore, we cannot, if we would, avoid the decision of the great issues and momentous questions arising out of this act.
The first question naturally arises,- whether those who are now waging war against the United States are in rebellion, *404 are traitors and have committed treason? or are they merely exercising a constitutional right in withdrawing from the Union, disregarding their allegiance to the United States, and rejecting and repudiating its authority? For, if the latter, they have committed no crime, and are therefore not legally liable to punishment.
In regarding the various powers of the United States government, as found in its constitution, it is impossible not to recognize its sovereignty. It has numerous and vast sovereign •attributes. It has citizens, in the most comprehensive and perfect sense of the term, with all their relations and duties,- and as much so as exist between the State and citizen. Can the State try him, and punish with fine and imprisonment, and even death, his offenses against her? So can the United States. Can the State take his property for public purposes against his will? So can the United States. Can she lay taxes on him and his property? So can the United States. Can she compel him to serve in the militia? So can the United States. Can she require him to attend as a juryman, or a witness, in her courts? So can the United States. Can she command him to aid her sheriff, as one of the posse comitatus, in executing the laws? So can the United States.
There is no difference between the relation which the citizen bears to the State and the United States, as to political and civil ties, save that the relation to the United States is of a more comprehensive character — being not only the same domestic and municipal relation, but the more extensive one, still, which corresponds to the whole circuit of national and international rights and'duties.
And, drawing with these corresponding duties, the corresponding right of protection every where, the States, by adopting the constitution of the United States, declare that they cannot and will not longer protect their citizens abroad. The States have no representatives in foreign countries, indeed, cannot have, because foreign governments do not recognize the States; they may know them, geographically, as a part of the United States, but do not recognize them as sovereign-ties. If a citizen of a State be imprisoned or oppressed in a *405 foreign land, he neither seeks redress through the legislature or governor of his State; but, as an American citizen, he seeks the protection of the United States, through "its agents and representatives.
The United States, in the exeicise of sovereign rights, have fixed the qualification of the representatives of the people and the Statés in Congress; and have fixed the qualification of most, if not all, the officers of the Federal Government, limiting that of President and Nice President to nativity.
The constitution of the United States is more than a compact; it is a government that enacts laws, executes its laws and administers its laws; and acts as directly and immediately upon the citizen, through its own agents, as does a State. (President Jackson’s Proclamation to the people of South Carolina, 1832.)
We consider the State governments and national government, as they truly are, in the light, of kindred systems, and parts of one whole, (82 No. Federalist.) The government of the United States forms part of the government of each State. These, the (States and national,) form one complete government. (Pennsylvania vs. Cobbett, 3 Dallas, 473.)
A case of great interest, originating out of the convention and nullification ordinance of 1832, came before the court of last resort in South Carolina, in which the three judges, delivered separate opinions. I quote, with approval, from the opinion of two of the judges, being a majority of the court. O’Neal, Judge, said: What is to be understood as the government of the people? The constitution of the State and the United States. They were the government of the people-of the State of South Carolina, operating alike, in their respective spheres, silently but with irresistible authority. To these instruments, as the expressed will of the people in the shape of paramount law, every citizen and officer is bound to yield obedience. Every act of Congress which conflicts with the constitution of the United States is by it annulled; every-act of the State legislature which conflicts with either the constitution of the United States or State is also void. They, (the two constitutions,) must together be sovereign, for together they constitute the entire will of the people, by which the government is to be administered in the State *406 and United States. Each is sovereign in its particular department of rule, for each can overrule every thing which is contrary to its particular provisions. (South Carolina ex relatione McCready, vs. Hunt, Col. 16 Reg. So. Car. Militia, 1 Hill, S. C. Rep. 494.) That the government created by the Federal constitution is, strictly speaking, and in every sense, a government of the people; .not of the whole people of the United States, as among themselves, but in this point of view, or the people of each State. As between it and foreign States, or nations, it is a government; for, within its prescribed constitutional limits, it acts upon the people, and enforces against them its laws, through its own judiciary, or that of each State. Within its own constitutional limits, it is absolute and supreme. (Same page, 497.)
Johnson, the President Judge of the court, said: The people have organized a government, clothed with all the powers that are necessary to protect the citizen in the enjoyment oí all his rights, privileges and immunities. It is that government which does protect the citizen, and to that government the allegiance of the citizen is due. If that had been a simple government, intended for the State alone, and confided to the administration of agents appointed by the State, and responsible to the State alone, no proposition, not even a mathematical axiom, could be more certain than that the citizen would owe allegiance exclusively to that government. But many of the powers of government, and those of the greatest importance, have been confided by the people to the government of the United States, whose agents are not appointed by, or responsible to, the State, except in. common with the other States; and to that government is confided the preservation of many of the' dearest rights of the citizen; among these may be mentioned the guaranty of the constitution of the United States which secures to each State a republican form of government. The government of the. United States has also the right to require of the citizen to contribute of his wealth to its support, and to serve in its armies. That government is, to all intents and purposes, as much the government of the people of South Carolina as the State govern *407 ment. They have both received their sanction, and they have consented to be bouud by them; and, if the conclusion of logic can be confided in, for the same reasons they owe allegiance to the State government they owe it to the government of the United States; sophistry may confuse the subject, but this must' be the conclusion whenever the unerring test of truth shall be applied. (Same, 518-19.)
Thomas Jefferson, in his letter to Major John Cartwright, 5th June, 1824, said: (vol. 4, page 396.) With respect to the State and Federal governments, I do not think their relations correctly understood by foreigners. They generally suppose the former subordinate to the latter. .But this is not the case. They are co-ordinate departments of one simple and integral whole. To the State governments are reserved all legislation and administration, in affairs which concern their own citizens only; and to the Federal government is given whatever concerns foreigners and citizens of other States; these functions alone being made federal. The one is the domestic, the other the foreign branch of the same government — neither having control of the other but within its own department.
In the case of Talbot vs. Janson et al, in the Supreme Court of the United States, (3 Dallas, 133, or 1 Peter's Condensed Reports, 68,) Patterson, Judge, and one of the frámers of the United States constitution, said: If the act of Virginia affects Ballard’s citizenship, so far as it respects that State, can it touch his citizenship so far as it regards the United Slates? Allegiance to a particular State is one thing, allegiance to the United States is another. Will it be said, that the renunciation of allegiánce to the former implies or draws after it a renunciation of allegiance to the latter? The sovereignties are different; the allegiance is different; the right too may be different. Our situation being new, unavoidably creates new and intricate questions. We have sovereignties moving within a sovereignty; of course there is complexity and difficulty in the system, which requires a penetrating eye fully to explore, and steady and masterly hands to keep in unison and order.
Mr. Curtis, in his History of the Constitution, (2 vol. page 379,) says: The highly complex character of a system, in which *408 the duties and rights of the citizens are thus governed by distinct sovereignties, would seem to render the administration oí the central power — surrounded as it is by jealoiis and vigilant local governments — an exceedingly difficult and delicate task. Its situation is without an exact parallel in any other country in the world. But it possesses the means which no government of a purely federal character has ever enjoyed, of an exact determination by itself of its own powers; because every conflict between its authority and the authority of a State may be made a judicial question, and, as such, is to be solved by the judicial department of the nation.
In Commonwealth vs. Morrison et al, (2 A. K. Mar., 77,) which involved the power of the State to tax the capital stock of the United States Bank, used in Kentucky, Judge Rowan, in delivering the opinion of the court, and in reference to the necessity, nature, and objects of the federal government, said, that the patriots and sages of America “viewed, in the thirteen existing republics, the materials furnished,as they fondly hoped by celestial agency, for a great national republic of interminable duration. While they saw, in the surrender made by the States of a portion of their sovereignty, a deposit formed, competent to all the purposes of national sovereignty, they saw, also, that the powers composing the national stock were enumerated, specified and defined; and they saw the retention by each State of so much sovereign power as left it competent to all the purposes of sovereignty not incompatible with its associated and intervolved positions.” Also, “It may, therefore, be said, with equal truth, that the < onstitution was formed by the people or by the States; and, using either mode of expression, the States, having been at that time plenary sovereigns, must be considered now as Jess so, by the destitution of so much power, only, as was expressly, or by fair implication, delegated to the nation by that instrument.” Again, “The powers conceded by the States to the nation were sovereign; but they did not concede all the sovereign power which they possessed, nor did what they retained become less sovereign by the retention; neither was reduced or degraded by the process.”
*409 In McCulloch vs. Maryland, before the Supreme Court of the United States. (4 Wheaton, 116,) Chief Justice Maeshall, in delivering the opinion of the court, said: “In America, the powers of sovereignty are divided between the government of the Union and those of the States. They are each*sovereign with respect to the objects committed to it, and neither sovereign with respect to the objects committed to the other.”
We have, not only the authority of the most august judicial tribunals and their solemn adjudications, the teachings of the fathers of our republic and those great men whose names adorn our history, but the constitution of the United States, by its own provisions, plainly shows us that it is invested with sovereign powers of the greatest magnitude. Among which may be enumerated the power to lay and collect taxes, duties, impost, and excise; to provide lor the common defence and general welfare of the United States; to regulate commerce with foreign nations and among the several States, and with the Indian tribes; to coin money, regulate the value thereof, and of foreign coin; and fix the standard of weights and measures; to establish a uniform rule of naturalization, and uniform'laws on the subject of bankruptcies; to declare war, and make rules concerning captures on land and water; to raise and support armies; to provide and maintain a navy; to make rules for the government and regulation of the land and naval forces; to provide for the calling forth the militia to execute the laws of the Union, suppress insurrection, and repel invasion; to provide for arming, organizing, and disciplining the militia; to make treaties with foreign nations, and to punish treason. It has power to make war without the consent of the States, nay, against the earnest protest of a State; yet, when the war is once declared, it involves the dissenting as well as the assenting States; arid, when it concludes peace, however injurious to the feelings of the State or humiliating to its pride, the sword must fall from its grasp. But few, if any, of these high prerogatives of sovereignty may the States exercise.
Self-government is said to be one of the most striking features of a nation. Does not the United States enjoy this at *410 tribute, both as to foreign and domestic concerns, in a far higher degree than any one of the States? Does it not represent and control, legislate for at home, and negotiate for abroad, the States, and the people of the States, whilst the States, nor the people of the States separately, can exercise corresponding power as to the Union? It is impossible that a government should be invested with these prodigious powers of self government and yet have no sovereignty.
This government is not only sovereign, but it is supreme, and designed to be perpetual.
In addition to many reasons already given, which apply as well to the supremacy and perpetuity as to the sovereignty of the United States, it may be said to be invested with national powers at home and international powers abroad; subordinate to no other government; supreme over all within its limits— which are among the highest characteristics of superior compared to inferior sovereignties.
Again. .No State can amend her constitution so as to conflict with the constitution of the United States; but, by the 5th article of the United States constitution, it may be amended, whenever two-thirds of both houses of Congress shall propose the amendment, or, on application of the legislatures of two-thirds of the States, Congress shall call a convention — which amendments, in either case, shall be valid when ratified by the legislatures of three-fourths of the several States, or by conventions in three-fourths thereof; and this, notwithstanding such amendments might be in conflict with some of the provisions of the State constitutions. And thus a State constitution might be pro tanto repealed; and this is the only legal and constitutional manner that a State constitution can in any way be altered or disregarded by the United States. Yet a State cannot amend its constitution so as to conflict with the United States constitution, as such amendment would be a nullity because in conflict with the supreme law of the land, and specifically prohibited by the 2d section, 6th article United States constitution. Again, to secure the faithful observance of this constitution in all time, it is provided by the 3d section, 6th article, that, not only the Senators and Representatives in Con *411 gress, but the members of the several State legislatures, and all executive and judicial officers, both of the United States and the several States, shall be bound by oath or affirmation, to support this constitution. And, that there should be an ultimate tribunal in which all controversies between the United States and a State or the citizen of a State, or between States, should be adjudicated and settled, and that the systems of national and State government might be made to work harmoniously as one whole, it was agreed by the States, in sections 1 and 2, article 3, constitution of the United States, to submit to the jurisdiction of the Supreme Court of the United States all controversies, in law or equity, arising under this constitution, the laws of the United States, and treaties made or which shall be made under their authority; to all cases affecting ambassadors, other public ministers and consuls; to all cases of admiralty and maratime jurisdiction; to all controversies to which the -United States shall be a party; to controversies between two or more States. And, finally, it is declared by article 6, of said constitution, “That this constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every State shall be bound thereby, anything in the constitution or laws of any State to the contrary notwith-standingAnd it is a remarkable circumstance, that this provision was originally proposed by a very earnest advocate of the rights of the States—Luther Martin. (Curtis’ His. Con., 2 vol. page 374; also, 2 vol. Madison Papers, 906-915.)
A very imposing casej growing out of the act of the Virginia legislature of 1777, to sequester British property, which contained this provision: “That it should be lawful for any citizen of Virginia, owing money to a subject of Great Britain, to pay the. same, or any part thereof, from time to time, as he should think fit, into the loan office, taking there out a certificate for the same, in the name of the creditor, with an indorsement, under the hand of the commissioner of the said office, expressing the name of the payer; and shall deliver such certificate to the Governor and the council, whose receipt shall discharge him *412 from so much of the debt,” and the treaty of peace between the United States and Great Britain of 1783, came before the Supreme Court of the United States at its February term, 1796. The treaty, in the 4th article, contained this clause: “It is agreed that creditors, on either side, shall meet with no lawful impediment to the recovery of the full value, in sterling money, of all Iona fide debts heretofore contracted.”
The defendant in error, having paid into the Virginia loan office, and having obtained a discharge, was sued in the United States court for the district of Virginia. It was universally conceded that, as the States had not surrendered the right of confiscation and sequestration by the articles of confederation, that they still possessed this as a sovereign right; but it was contended, that, in making the treaty of peace, they had agreed to surrender the same, and that afterwards, when they made the constitution of the United States, they had again agreed to the surrender of such right and the repeal of their laws enforcing the same.
Chase, Justice, in his opinion, says: “If doubts could exist before the establishment of the present national government, they must be entirely removed by the 6th article of the constitution. There can be no limitation on the power of the people of the United States. By their authority the State constitutions were made, and by their authority the constitution of the United States was established; and they had power to change or abolish the State constitutions or to make them yield to the general government, and to fieaties made by their authority. A treaty cannot be the supreme law of the land, that is of all the United States, if any act of a State legislature can stand in its way. If the constitution of a State, which is the fundamental law of the State, and paramount to its legislature, must give way to a treaty, and fall before it, can it be questioned whether the less power, an act of the State legislature, must not be prostrate? It is the declared will of the people of the United States, that every treaty, made by authority of the United States, shall be superior to the constitution and laws of any individual State; and their *413 will alone is to decide. Four things are apparent on a view of this sixth article of the national constitution.
1. That it is retrospective, and is to be considered in the same light as if the constitution had been established before the making of the treaty of 1783.
2. That the constitution or laws of any of the States, so far as either of them shall be found contrary to that treaty, are, by force of the said article, prostrate before the treaty.
3. That, consequently, the treaty of 1783 has superior power to the legislature of any State, because no legislature of any State has any kind of power over the constitution, which was its creator.
4. That it is the declared duty of the State judges to determine any constitution or laws of any State, contrary to that treaty, or any other, made under the authority of the United States, null and void. National or federal judges are bound by duty and oath to the same conduct.” (Ware, admr. of Jones, vs. Hylton, et al, 3 Dallas, 199, or 1 Peters, Cond. Rep., 112-13.) Cushing, Justice', says: “To effect the object intended, there is no want of proper and strong language; there is no want of power, the treaty being sanctioned as the supreme law by the constitution of the United States, which nobody pretends to deny to be paramount and controlling to all State laws, and even State constitutions, wheresoever they interfere or disagree.” (Same case, 1 Peters Cond. Rep. p. 131.)
Here was a strong case. The State had exercised an undoubted sovereign right, which she then possessed — her citizen had been discharged from his liability to the British creditor — yet the supreme court held that by virtue of the treaty of peace and the constitution of the United States, both made after the extinguishment of the debt, that the right of the creditor, and' the liability of the debtor, revived, and this even in contravention of State laws or State constitutions.
The original articles of confederation and perpetual union had not provided for an executive officer to execute the laws, nor for a judiciary to administer them; and, so meagre were the powers confei’red upon Congress, that Chief Justice Taney truly said, in the Bred Scott case, that Congress was little *414 more than an assemblage of ambassadors representing different sovereignties, without the power of executing their determinations.
Experience soon developed the imperious necessity of having a government capable of enacting, executing, and administering its own laws through its own agencies. The preamble and enacting clause to the United States constitution announced that such a government was intended to be called into existence. “We, the people of the United States, in order to form a more perfect union, establish justice, insure domestic tranquility, provide for the common defense, promote the general welfare, and secure the blessings of liberty to ourselves and our posterity, do ordain and establish this constitution for the United States ”
Pursuant to a unanimous • resolution of the convention, Washington, as the president of the convention, addressed a letter to the president of Congress, laying before that body the constitution, in which he says: “It is obviously impracticable, in the federal government of these States, to secure all rights of independent sovereignty to each, and yet provide for the interest and safety of all. Individuals entering into society must give up a share of liberty to preserve the rest. The magnitude of the sacrifice must depend as well on situation and circumstance, as on the objects to be obtained. It is at all times difficult to draw with precision the line between those rights which must be surrendered, and those which may be reserved; and on the present occasion this difficulty was increased by a difference among the several States as to their situation and extent, habits, and particular interests. In all our deliberations on this subject we kept steadily in view that which appears to us the greatest interest of every true American, the consolidation of our Union, in which is involved our prosperity, felicity, safety, perhaps our national existence.” (Federalist, page 491.)
The framers of the constitution resorted to an enactment of that instrument by the people of the United States, and employed language which speaks in their name, for the express purpose, among other things, of bringing into action a na *415 tional authority, on certain subjects. The organs of the general government, therefore, are not the agents of the separate will of the people of each State, for certain specified purposes, as its State government is the agent of their separate will for all other purposes; but- they are the agents of the will of a collective people, of which the inhabitants of a State are only a part. That the will of the whole should not be defeated by the will of a part, was a purpose of the supremacy assigned to the constitution of the United States; and that the rights and liberties of each part not subject to the will of the whole, should not be invaded, was a purpose of the careful enumeration of the objects to which that supremacy was extended. (Curtis' His, Con., 2 vol. 381.)
In order to preserve the whole, it must preserve each part. Therefore it is provided by the 4th section, 5th article, the United States shall guarantee to every State in the Union a republican form of government, and shall protect each State against invasion.
Here, then, is an august government, with power to make war and conclude peace; repel invasion and suppress insurrection; with provisions for the amendment of its own constitution, that the imperfections which experience may point out may be remedied, and that it should, from time to time, be so adapted to the progress of the age, its wants, and necessities, as to accomplish the great purposes declared in the preamble. And, -that none of its parts should be perverted, guaranteeing to each State a republican form of government, which is also a guaranty that it, too, shall remain a^epublic. With a Supreme Court, independent, in the very nature of the tenure of office of the judges, of popular clamor and sectional preju-dicies, as a great and final forum to adjudicate all matters of law or equity between the United States and a State, or between States.
And, only by its consent, can new States be formed and admitted into the Union, out of all that vast territory extending, at the time of its formation, from the Ohio river to the lakes, and, by subsequent acquisition, from the Mississippi river to the Pacific ocean; and, until this-consent can be obtained, the *416 people of these territories remain mere dependencies; the government appointing their executive and judicial officers, sometimes even their legislative ones, and sometimes requiring the assent of the national legislature to their local enactments before they become operative.
Then, whether we take the judicial expoundings, regard the current history of the day, or the teachings of the great founders of the republic, or confine the investigation alone to the principles, powers and objects of the government, as defined in the constitution, it is equally plain that sovereignty, supremacy, and perpetuity, are fundamental principles of the constitution; and that neither the destruction of the United States constitution, or any of the States, was ever contemplated by the constitution or its framers. Yet this great central government, with all its vast attributes of sovereignty, supremacy and perpetuity, is a government of limited powers and specified grants, and can exercise no authority unless explicitly granted or necessarily implied therefrom.
It follows, that none but revolutionary action can by any possibility deny its sovereignty, reject its supremacy, or attempt the destruction of its perpetuity. Whether it be through the agency of revolutionary conventions, as by some of the seceded States, or by act of the legislature as in others, all are equally unconstitutional, revolutionary, and acts of hostility towards the Federal government; are simply efficient means by which the organizations and government of the States are seize ! and perverted to revolutionary purposes, compelling the citizen to a hostile attitude against the local government by which he is immediately surrounded, else driving him from his allegiance to the United States and forcing him to rebel against its constitution and legitimate authority. The usurpation and perversion of the State governments thus became an irresistible engine in the hands of revolutionists to compel into submission thousands upon thousands of their citizens, contrary to their most sacred con\ictions.
The State governments, having thus been seized, the civil power of the United States was either expelled oi; broken down, but the United States still held military power and had *417 possession of many forts within such States. To expel this power required actual force, actual hostility, actual war; and, for this emergency, the revolutionists,began an immediate preparation, by organizing for themselves a central government, raising and equipping an army, and providing for a navy, and in due time assaulted and expelled the United States garrison from Fort Sumpter. Thus civil war was actually inaugurated among the American people, a hostile power, called the Confederate States of America, was set up, and actually engaged in war with the United States. This hostile power, having no justification in the constitution of the United States, all those who espoused its cause by going into its service, adhering to it, by giving it aid and comfort, became rebels — traitors—violated their allegiance to the United States constitution, and committed treason against it.
As these were all rebels and traitors, — I use these terms in their legal signification, and notas mere terms ofopprobium,— what punishment can be constitutionally inflicted on them, for this„the greatest crime against civil society?
A preliminary question should be here disposed of. It has been urged, with zeal and earnestness, that the limitation found in the latter clause of section 3, article 3, of the United States constitution, that “no attainder of treason shall work corruption of blood or forfeiture except during the life of the person attainted,” applies only to real estate; and that, as to all other estate, Congress has unlimited power.
To understand correctly the meaning of the term “forfeiture,” as used in the constitution, it will be necessary to examine how the laws of England stood at the time of the separation of the United States from her, and, to some extent, the history of the legislation of the States before the treaty of peace of 1783.
The consequences of attainder are forfeiture and corruption of blood. (4 Blk. Com., 381.) Forfeiture is two fold; of real and. personal estate. First, as to real éstate; by attainder in high treason a man forfeits to the king all his lands and tenements of inheritance, to be forever vested in the crown. This-forfeiture relates backward to the time of the treason committed, so as to avoid all intermediate sales and incumbrancqs. *418 But, though after attainder, the forfeiture relates back to the time of the treason committed, yet it does not take effect unless an attainder be had, of which it is one of the fruits; and, therefore, if a traitor dies before judgment pronounced, or is hanged by martial law, it works no forfeiture of his lands, for he never was attainted of treason. But, if the chief justice of the King’s Bench, (the supreme coroner of all England,) in person, upon view of the body of one killed in open rebellion, records it and returns the record into his own court, both lands and goods shall be forfeited. (Same page, 381.) Again. There is a remarkable difference or two between the forfeiture of lands and goods and chattels. 1. Lands are forfeited upon attainder, and not before; goods and chattels are forfeited by conviction, (verdict of the jury.) Because in many cases, where goods are forfeited, there never is any attainder; which happens only where judgment of death or outlawry is given. 2. In outlawry for treason or felony, lands are forfeited only by the judgment; but the goods and chattels are forfeited by a man’s being first put in the exigent, without staying till he is quinto exactus, or finally outlawed.
• The forfeiture of lands has relation to the time of the fact committed, so as to avoid all subsequent sales and incum-brances; but the forfeiture of goods and chattels has no relation backwards; so that those only which a man has at the time of conviction shall be forfei'ed. Therefore a traitor or felon may bona fide sell any of his chattels for the sustenance of himself and family, between the fact and conviction. (4 Blk. Com., 387.)
Notwithstanding there were differences between the forfeiture of lands and personal property, yet the forfeiture of both followed from attainder; both forfeiture and corruption of blood were consequencies of attainder, but forfeiture was not a consequence of the corruption of blood, nor was corruption of blood a consequence of forfeiture. And, although there were more safe-guards thrown around real estate, by the English law, than personal estate, yet this cannot be a sufficient reason for exempting this class of property from the constitutional protection.
*419 The great expounders of the constitution, in the earlier days of the republic, when neither passions, prejudices nor partial-ities had been excited by a great civil commotion, all so understood its provisions.
Mr. Madison, in 43d number of Federalist, says: As treason may be committed against the United States, the authority of the United States ought to be enabled to punish it; but as newfangled and artificial treasons have been the great engines by which violent factions, the natural offspring of free governments, have usually wreaked their alternate malignitjr on each other, the convention have, with great judgment,' opposed a barrier to this peculiar danger, by inserting a constitutional definition of the crime, fixing the proof necessary for conviction of it, and restraining the Congress, even in punishing it} from extending the consequences of guilt beyond the person of its author.
Blackstone, (4 vol. p. 380,) assigns the reasons of the common law for its extreme punishment as follows: When sentence of death, the most terrible and highest judgment in the laws of England, is pronounced, the immediate and inseparable consequence from the common law is attainder. For when it is now clear beyond all dispute, that the criminal is no longer fit to live upon the earth, but is to be exterminated as a monster and a bane of human society, the law sets .a note of infamy upon him, puts him out' of its protection, and takes no further care of him than barely to see him executed. He is then called attaint, atlinctus, stained or blackened. And the consequences, forfeiture and corruption of blood.
Judge Story, comménting upon this 3d section, 3d article of the constitution, and referring to the reasons of the common law for its harsh punishment, says: But this' view of the subject is wholly unsatisfactory. It looks .only to the offender himself, and is regardless of his iijnocent. posterity. It really operates a posthumous punishment upon them; and compels them to bear, not only the disgrace naturally attendant upon such flagitious crimes, but takes from them the common rights and privileges enjoyed by all other citizens, when they are wholly innocent, and however remote they may be in their *420 lineage from the first offender. It surely is enough for society to take the life of the offender, as a just punishment of his crime, without taking from his offspring and relatives that property, which may be the only means of saving them from poverty and ruin. It is bad policy, too, for it cuts off all attachment which these unfortunate victims might otherwise feel for their own government, and prepares them to engage in other services, by which the supposed injuries maybe redressed, or their hereditary hatred gratified. Upon these and similar grounds, it may be presumed, that the clause was first introduced into the original draft of the constitution, and, after some amendments, it was adopted without any apparent resistance. The history of other countries abundantly proves that one of the strong incentives to prosecute offences, as treason, has been the chance of sharing in the plunder of the victims. ’ Rapacity has been thus stimulated to exert itself in the service of the most corrupt tyranny; any tyranny has been thus furnished with new opportunities of indulging its malignity and revenge; of gratifying its envy of the rich, and good; and of increasing its means to reward favorites, and secure retainers for the worst deeds. (Story's Com. Const., 3 volume, section 1235.)
That this limitation on the power of forfeiture applies to real estate, all concede, yet this act of Congress attempted to apply forfeiture absolutely to it. True, that, to save the act from executive veto, Congress passed a joint resolution declaring, among other things, that no punishment or procedure under said act should be construed so as to work a forfeiture of real estate of the offender beyond his natural life.
If the'great object of the limitation found in this section 3, article 3, of the constitution, be to limit the punishment to the offender, and to secure his offspring and relatives from punishment because of his offenses, it must necessarily embrace personal as well as real estate. In many instances, in this commercial country, all that a man possesses is personalty; in a great majority, a very large, if not the larger portion, of each man’s estate is personalty; and perhaps all the States without exception provide as definitely who shall take the personalty *421 of intestates as who shall take the realty; and it is as much a punishment to take from those entitled to the personal estate as to take a like amount in value from those entitled to the real estate.
There is nothing in the language of the constitution to justify the exemption of real, more than personal estate; nothing that leaves personal estate less protected than real estate; nothing in the history of the times when the constitution was made to justify the belief that any such discrimination was intended; nothing in the cotemporaneous expoundings of the constitution which justifies such discriminations. The limitation is “that no attainder of treason shall work corruption of blood or forfeiture, except during the life of the person attaint-ed.” Is it not most apparent that, had the framers of the constitution intended to limit this power of forfeiture to lands, they would have added the words, of real estate, after “forfeiture?” The language would then -have been clear and explicit, that “no attainder of treason shall work corruptiion of blood or forfeiture of real estate, except during the life of the person attainted;” it would then have required no metaphysical reasoning or attenuated argument to so construe it. The term “forfeiture” is sufficiently comprehensive to embrace every thing which may be possessed and be the subject of forfeiture; and, as the qualifying words “of real estate” are not connected with it, nor in the section, it was evidently intend-' ed to embrace, does actually embrace, and must necessarily be construed to embrace, personal as well as real estate, and,"consequently, the same constitutional restriction applied to real : estate must be applied to personal-estate. The purposes assigned by the common law for the forfeiture of personalty to the king, “for the trouble and charge he has been at in holding courts and bringing offenders to justice,” (4 Bac. Abridg., title Forfeiture, letter B, page 340,) are alike wholly unsatisfactory and at war with the nature of our government. The whole genius and theory of our constitution and ’laws are to punish the offender for the offense, and thereby deter the vicious from the commission of crime; whether this be by fine, imprisonment, forfeiture or death, and not to compensate the *422 government for its trouble and expense in holding courts, though fines are oiten-times thus appropriated.
Why it is not quite as easy and rational to construe a conspiracy to make war, a treason, under the section of the constitution which declares that treason shall consist only in levying war against the United States, or in adhering to their enemies by giving them aid and comfort, as it is to construe the limitation that no attainder of treason shall work a forfeiture except for the life of the person attainted, to embrace only a part of his estate, is not perceived. Give these constructions, and then, by some other ingenious invention, construe away the requirement of the testimony of two witnesses to each overt act, and we sháll have nearly opened the broad door of the common law to constructive treasons and extreme punishments, not only of the offender, but of all those who are in any way to inherit or receive from him. Yet it has uni formly been determined that a conspiracy to make war was no treason; that the war must actually be levied before a treason could be committed. (See 3 Story’s Com. on Const., sec. 1794, page 669; also, United States vs. Burr, 4 Cranch, 469.)
Georgia, Maryland, Virginia, North Carolina and other ■States, had passed confiscation laws, embracing every character of estate which their citizens owned who adhered to the British crown; and several of the States had enacted laws confiscating and sequestrating the estates of British subjects, found within their jurisdiction, who had never been citizens of the State. Great Britain, too, had her confiscation laws. Much vexatious litigation had sprung out of these mutual confiscation laws, and the treaty of 1783; the wreck of many fortunes, the ruin of many men, their families and offspring, were to be seen scattered throughout the land. The oppression and injustice, the strife and hate, growing out of the confiscations of the Revolution, were fresh in the memory of the framers of the constitution; and, with all these in their recollection, the limitation on the power of forfeiture was adopted; and clearly embraces both real and personal estate.
This act of Congress, approved July 17, 1862, must, then, be -tested by this constitutional standard. By the 5th section of *423 said act it is enacted, “That to insure the speedy termination of the present rebellion, it shall be the duty of the President of the United States to cause the seizure of all the estate and property, money, stocks, and credits and effects of the persons hereinafter named in this section, and apply and use the same and the proceeds thereof for the support of the army of the United Slates.” Although this section appropriates the proceeds of the property to be seized and condemned, to the support of the army, and for the purpose of suppressing the rebellion; yet, by its own provision, the title of the act, the previous and subsequent sections of the act, if is apparent that it was intended as a punishment — a forfeiture of rebel property for their treasonable acts.
The intent never to pay for property, thus authorized to be seized, is so obvious, and the language of the act is so inappropriate for such a purpose, that it cannot be conceived that it was intended as an exercise of the right of eminent domain —the right of the government to resume the estates of the citizen for public use — and would be such a palpable violation of the last clause of article 5, amendments to the constitution, which provides, “nor shall private property be taken for public use without just compensation,” that it would be doing great injustice to the intelligence of the Congress that enacted it, as well as great violence to the language of the act, so to construe it. It must, then, be what the title of the act, and the language of the act, purports to be. a forfeiture — a punishment for crime, to-wit, for engaging in the rebellion or aiding those in rebellion; or, in other words, for committing treason.
It is, then, a punishment for crime — treason—to be established before a court of the United States; not upon an indictment, arraignment, and trial by his peers, confronted by the witnesses, and the testimony of two witnesses to each overt act, the unanimous verdict of twelve impartial persons, which may be selected after the right of challenge by the accused shall have been exercised or waived, and the judgment of the court pronouncing sentence upon the verdict of guilty, after the accused shall be heard by himself and counsel; all of which are understood to be rights secured by the constitution; but it *424 is by an ex parte proceeding in rem, in the absence of the party and without his knowledge; and, though the trial may be by-jury, it is to be selected without the exercise of the right of challenge, without the testimony of two witnesses to each overt act, without being confronted by the witnesses, without being heard by himself or counsel; the accused is convicted, stripped of his estate, impoverished, his innocent offspring ruined, with the traitor’s seal placed upon him, attaching disgrace to his posterity, by the solemn adjudication of the court.
After being thus punished by a proceeding in rem he may return or be captured, indicted, put upon his trial, convicted, and sentence of death pronounced by the court. Or, he may be acquitted after a fair trial, by an impartial jury, being confronted by the witnesses, and the testimony of two witnesses to each overt act being required, and having been heard by himself and counsel; and thus, by the most solemn act and highest evidence known to the law, such as shall never be gainsayed by any subsequent proceedings, hemay stand acquitted, his innocence of crime manifested. Still, by another proceeding in rem, he finds himself convicted, his property confiscated, himself and offspring ruined, for the very crime he now stands acquit of committing.
To prevent such inconsistencies and sad injustice, among other securities, article 5 of the constitution provides, that “no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia when in actual service in time of war or public danger; nor be deprived of life, liberty, or property without due process of lawf ’ and, if the intent to make this of universal application- could be made more imposing by anything, than by the import of the terms used, this thing is to be found in the exceptions contained in the article, and must apply to all cases not within the exceptions.
Let us pause a moment to consider what is meant in the constitution, “by due process of law,” without which no person is to be deprived of life, liberty, or property. Lord Coke, (2 Inst., 50,) gives, as the settled construction and true meaning of the *425 words “or by the law of the land,” in Magna Charta, “without due process of law, so that no man be taken, imprisoned, or put out of his free-hold, without due process of law; that is, by indictment of good and lawful men.” Judge Kent, in his 24th lecture, (1 vol. Com., 8 edition, 612,) says: “It may be received, as a proposition universally understood and acknowledged throughout this country, that no person can be taken or imprisoned; or disseized of his free-hold or estate; or exiled or condemned; or deprived of life, liberty, or property, unless by the law of the land, or judgment of his peers. The words, by the law of the land, as used originally in Magna Charta, in reference to this subject, are understood te mean due process of law, that is, by indictment or presentment of good and lawful men. The better and larger definition of due -process of law is, that it means law in its regular course of administration, through courts of justice. Judge Story, in his Commentaries on the Constitution, (vol. 3, sec. 1783, page 661,) says: “The other part of the clause is but an enlargement of the language of Magna Charta, nec super eum ibimus, nec super eum mittimus, nisi per legale judicium parium suorum, vel per legem terree, neither will we pass upon him, or condemn him, but by the lawful judgment of his peers, or by the law of the land. Lord Coke says these latcer words, by the law of the land, mean by due process of law, that is, without due presentment or indictment, and being brought in to answer thereto by due process of the common law. So that this clause, in effect, affirms the right of trial according to the process and proceedings of the common law.”
In Ely vs. Thompson, (3 A. K. Mar., 74,) in commenting on a corresponding clause in our State constitution, Judge Mills, who delivered the opinion of the court., said: “It is evident this section contemplated more kinds of public or criminal prosecutions, than those which are carried on by indictment or information. In all it secures the right of being heard; of obtaining the nature and cause of the accusation; of confronting the witnesses and disproving their evidence; in those by indictment, or information, a trial by jury is secured. Determining what is the meaning of and included in the words ‘crimi* *426 nal prosecutions’ in this section, measurably controls the whole section. They evidently mean any prosecution carried on in the name of the Commonwealth for anyofFense or crime against society. The word criminal is used as opposed to civil suits or actions. The one includes all suits of the government, the end and design of which is punishment of the accused; the other embraces all actions for individual redress.”
The essential provisions of the clause of the State constitution are so identical with that of the United States, that these remarks apply with equal force to the latter; and, notwithstanding the State constitution may contemplate more kinds of criminal prosecutions than that of the United States, yet the great and essential requisites of atrial upon indictment are in-, dispensable to a conviction.
It is further declared, in article 6, amendments to the constitution, that, “in ail criminal prosecutions, the accused shall enjoy the right of a speedy and public trial, by an' impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process 'for obtaining witnesses inhis favor; and to have the assistance of counsel for his defense.” So essential to the security and liberty of the citizen were these safe-guards deemed, that these explicit amendments were sought and obtained to the constitution.
‘ Are these solemn declarations of rights, these great safeguards to the security of the citizen, to be swept away by the furor of this rebellion? Are not the loyal citizens interested in the preservation of these great bulwarks of their liberty, for themselves and posterity? These proceedings may to-day be the engines of punishment to the rebels, but, in the future, they may be the instruments of oppression, injustice and tyranny to themselves or their posterity. If these are as valuable as we have been taught by our fathers to regard them, they are worth vastly more to us and our posterity than any amount of property the rebels may own, though it were a hundred fold more than it is, and though it were both desirable and certain *427 that we should secure all they possess. Or, if viewed in the light of punishment alone, would it not be the hight of madness and folly to throw away our own shield and safe-guard, revolutionize our government, endanger our liberties, in order to punish our enemies?
The framers of the constitution, having closed the door against legislative attainder, both by the national and State legislatures, first by section 9, sub-section 3, article 1, United States Constitution, which provides that “no bill oj attainder or expost facto law shall be passed” by Congress — second, by section 10, sub-section 1. same article, which, among other things, provides that no State shall “pass any bill of attainder expost facto law,” &c., it only remained to place the proper restriction on judicial attainder for treason, to get rid of the gross injustice, oppressions and tyranny of the common law, British statutes, and the machinery of the English government, 'often invoked to crush and ruin those who had become obnoxious to the reigning dynasty, as well as the unjust and oppressive acts of the American States, passed under the deep and excited resentments oí the Revolution. And this was most effectually done, by this section 3, article 3, declaring in what treason should consist, and limiting the consequences of attainder for treason to forfeiture for the life of the offender, as to property.
In Gaines vs. Buford, (1 Dana, 509,) Judge Alien olas, one of Kentucky’s ablest jurists, has well said: “Bills of attainder are said by Woodeson, in his lecture, to be acts of supreme power, pronouncing capital sentences where the legislature assumes judicial magistracy; and bills of pains and penalties, those which inflict milder punishments. But it is believed that bills of attainder is a generic term, comprehending both descriptions of acts; such, at least, is believed to be its true signification as used in our constitutions. Thus, it is said by the Supreme Court of the United States, in Fletcher vs. Peck, (6 Cranch, 138,) ‘a bill of attainder may affect the life of an individual or may confiscate his property, or both.’ So, also, it is said by Judge Tucker, in his edition of Blackstone, (vol. 1, p. 292,) ‘bills of attainder are legislative acts, passed for the *428 special purpose of attainting particular individuals of treason or felony, or inflicting pains and penalties beyond or contrary to the common law.’ That the term should be received in the large sense thus given to it, is consonant with the true republican character of our institutions. A condemnatory act of the legislature, inflicting upon an individual or class of individuals pains and penalties, is as much within the reason of the prohibition as if it inflicted capital punishment. They are equally hostile to the principles of civil liberty and the spirit of our constitutions. They are equally engines of tyranny and oppression, and equally unsuited to the government of a free people.” Again, he says: “Bills of attainder have generally designated their victims by name; but they may do it, also, by classes, or by general description fitting a multitude of persons. Either mode is equally liable to moral and constitutional censure. They have generally been applied to punish offenses already committed; but they have been, and may be, applied to the punishment of those thereafter to be committed, or for criminal omissions thereafter occurring.”
As the constitution of the United States is a part of the government of each State, so is the constitution of each State a part of the government of the United States; it takes the two to make a perfect government, whether this be said of the one or the other. All the sovereignty, supiemacy, and perpetuity of the United States is found in the express and implied grants from the States and the people of the States, as specified in the constitution; this supreme government has, as the foundation for its superstructure, the States. All the sovereign powers not delegated to the United States, nor prohibited to the States, are yet reserved to the States or people, with the supreme right to legislate on, and control all the domestic affairs of the people ol the respective States, which are not confided by the constitution to the Federal government. The constitution of each State, within its sphere, and not in conflict with the constitution of the United States, is as sovereign, supreme, and designed to be as perpetual, as the constitution of the United States. The States have not only the written guaranty, as found in the United States constitution, that they shall have *429 a republican form of government and be protected against invasion, but, if the United Rt.ates constitu.ion would preserve its own perpetuity, it must preserve the sovereignty, supremacy and perpetuity of each State, within its proper sphere, and when it shall fail to do this it will have been revolutionized.
It is then, constitutionally, as impossible for the United States to disregard the rights of the States, their constitutions and laws, not in conflict with the constitution of the United States and its laws, made in pursuance thereof, — and thus destroy a State, — as it is for a State, constitutionally, to secede from the Union and disregard the constitution and laws of the United States.
As the constitution oí the United States never contemplated its own destruction, so it never contemplated the destruction of a State constitution. “The States are, in that instrument, (constitution of United States,) intertwined with the nationa government, as essential parts thereof. They could not bel considered competent to subserve the purposes of their desti nation, as constituent parts of that government, in any other-than a sovereign character. The Senate, the most important pillar in the fabric of that government, is composed entirely of State materials. It is, in the government of the nation, the representative of the sovereignty of the States, and was designed not only to check and control popular furors, executive aberations and judicial delinquencies, but to infuse into executive agency its monitory influence.” (Commonwealth vs. Morrison, 2 A. K. Mar., 87—8.)
Nor can there be any conflict between the States and United States government, growing out of this doctrine; for, as has been said by the Supreme Court, in Chief Justice Marshall’s opinion in McCulloch vs. Maryland, before recited: “The sovereignty of a State extends to everything which exists by its own authority, oris introduced by its permission; but does it extend to those measures which are employed by Congress to carry into effect powers conferred on that body by the people of the United States? We think it demonstrable that it does not. Those powers are not given by the people of a single State. They are given by the people of the United States, to *430 a government whose laws, made in pursuance of the constitution, are declared to be supreme. Consequently, the people of a single State cannot confer a sovereignty which will extend over them. If we measme the power of taxation residing in a State, by the extent of sovereignty which the people of-a single State possesses, and can confer on its government, we have an intelligible standard applicable to every case to which the power may be. applied. * * * We have a principle which is safe for the States, arid safe for the Union. We are relieved, as we ought to be, from clashing sovereignty; from interferring powers; from a repugnancy between a right of one government to pull down what there is an acknowledged right in another to build up; from the incompatibility of aright in one government to destroy what there is a right in another to preserve.”
This same doctrine was again brought under review, at the December term, 1862, of the Supreme Court of the United States, in the Bank of Commerce vs. New York City, and unanimously adhered to — opinion by Justice Nelson.
It will be remarked, that, for convenience, and for the want of a better mode of expressing the meaning, courts and others often speak of the State governments and United States government, as separate and distinct governments; butthis is generally done in reference to the separate powers which belong exclusively to the one, or the other, and not as in the least militating against the principle, that for many purposes they are essentially one and the same government, in each State.
That the United States is sovereign and supreme, within its constitutional sphere, and that the States are sovereign and supreme within their proper spheres, and that both are parts of the same sovereign government, for the same people, and that there is a line of demarcation, by which to determine the proper jurisdiction and supremacy of each, and that where the supremacy of the one begins, the other ends, or, in other words, where the State supremacy ends, the Federal supremacy begins, have been affirmed in one way, and another, by an unbroken current of decissions of the Supreme Court of the United States from the case of Ware's adm'r. vs. Hylton, 1796, (3 *431 Dallas,) down through Osbourne, &c. vs. Bank United States, 1824, (9 Wheaton;) Brown vs. Maryland, 1827, (12 Wheaton;) Weston vs. Charleston City, 1829,(2 Peters;) Providence Bank vs. Billings Pittman, 1830, (4 Peters;) Worcester vs. Georgia, 1832, (6 Peters;) Rhode Island vs. Massachusetts, 1838, (12 Peters;) United States vs. Graceatt, 1840, (14 Peters;) Dobbins vs. Com'r. Erie Co., Pa., 1842, (16 Peters;) West River Bridge Co. vs. Battleboro, 1848. (6 Howard;) Smith vs. Health Com'r. of N. F, 1849, (7 Howard;) to the cases before recited, both from the Supreme Court of the United States, and the States.
Ample powers, to enforce the .observance of the constitution and laws of the United States, by each State, and the people of the State, are conferred by the constitution upon its legislative, executive and judicial departments; and, by peaceable means, unless in cases of insurrection, when ample war powers to suppress the same are conferred; but this is the full measure of the powers conferred on the government. Beyond this it cannot go. It has no constitutional power, through any or all of these agencies, to prostrate a sovereign State, its constitution and laws. We know, as a historical fact, that the convention which framed the constitution refused to confer upon the Federal government the power to make war on a State; experience has demonstrated the wisdom of this refusal.
Such a thing as a State constitution becoming forfeited by reason of crime, is a constitutional impossibility. Conspirators and rebels, as has been shown, may get control of the State organization, and thereby control the people; but all such acts are usurpations and nullities, and as much in conflict with the State constitution and government as in conflict with the United States constitution and government. And, when t.he organized power of the rebellion shall be broken down, then the constitution and laws of the United States again become operative in the rebellious States; and, as a part of the government and constitution of the United States, the constitution and laws of the respective States, which were so recognized by the United States before the rebels usurped the State government, also become operative.
*432 The Federal government was bound by duty and constitutional obligation to protect the people of the States against domestic violence and revolution, and every loyal man in such States had a right to rely on the government for a discharge of those duties; but, either for a want of ability or inclination, it failed, until a rebellion of gigantic proportions was organized. After being thus derelict, it would indeed be a monstrous immorality for the government itself to persist in a disregard and violation of those constitutions and laws, instead of discharging its most solemn constitutional obligations.
The Federal government, through all of its departments, has acknowledged this obligation to the loyal men of the seceeded States, by its acts, many oí which are wholly inconsistent with the idea that it regards them or would treat them as alien enemies because of the unfortunate condition of their States. .The Supreme Court still recognizes the venerable Catron, of Tennessee, and Judge Wayne, of Georgia, as part of its bcdy. Judge Lane, a citizen of Alabama, is still recognized as the Judge of the United States District Court for that State. Andrew Johnson, a Senator for, and citizen of Tennessee, was permitted to retain his seat in the Senate long after the separation act of the Tennessee Legislature. Horace Maynard, another citizen, was permitted to retain his seat in the House of Representatives. Emerson Etheridge, another citizen, was elected Clerk of the House of Representatives, and held the full term; all after the separation act. Judge Trigg, another citizen of Tennessee, is now the United States District Judge for that State, by executive appointment Jong after said separation act. Andrew Johnson is now Brigadier General, and' military Governor of Tennessee. General Carter, a citizen of Tennessee, holds a commission as Brigadier, and is in command oí a large force of commissioned officers, privates, &c., all Tennesseans — and all these officers by executive appointment since said separation act.
Surely the Supreme Court would not recognize and permit an alien enemy to sit as part of its constituent body, to adjudicate the graveest questions, in which their own government, orits people, would be vitally interested.
*433 Congress would scarcely let alien enemies sit and vote with them, on measures of the most momentous character, involving the destiny of this government, and theirs.
The chief executive officer of the nation would scarcely be so unmindful of his official oath and duty, as to appoint to stations of the most important trust, both civil and military, alien enemies.
There is but one theory upon which these various actions can be sustained; and that is, that all the secession ordinances and legislative acts are unconstitutional and wholly void, and do not in any wise disturb the relations of the citizen to the Federal government, who still recognizes his allegiance thereto, and can by no possibility forfeit any rights, of person or property, of his.
It would, indeed, be a strange inconsistency in the govern- - ment to recognize the officer, and his official conduct, and pay him his salary, and then turn about and take his property, or' debar him of his rights of person or property, because of hia-residence in a seceded State. The loyal citizens of these-States, unquestionably, still retain all their original rights, subject however, for the time being, to the provisions of the non-intercourse laws and regulations of the Treasury Department,, made in pursuance thereof; and, to a great national policy growing out of the necessities of the present situation, and; such as is calculated to prevent the enemy from being bene-fitted.
This act of Congress, not only, in contravention of the United States constitution, forfeits absolutely the personal estate of the rebels, but also declares his slaves free, in contravention of the legitimate constitution and laws of the seceded-States, and also in contravention of the constitution and laws of the loyal States; thus perpetrating the double violation of the United States constitution and State constitutions, and destroying an essential and integral part of its own government.
Is it possible that loyal States have forfeited any rights by this rebellion? Can it be that their constitution and laws which existed previous to the rebellion, and were respected- and observed by the Federal government, are any the less ob? *434 ligatory and sacred now than then? Is it possible that the loyal citizens, of the loyal States, have lost the right to enact their own laws, not inconsistent with the constitution of the United States and laws enacted in pursuance therewith, and have those laws observed by that government for which they have so freely poured out their blood and treasure? These are great and essential principles in our system of free government that should not be thrown away, merely for the gratification of punishing rebels; and, when once lost, may never be regained.
Can this act of Congress, so violative both of the United States and State constitutions, be upheld, either by the laws of nations, or by the laws and usages of war, as recognized by modern civilized and Christian nations?
Chief Justice Marshall, in delivering the opinion of the Supreme Court of the United States, in the case of the United States vs. Percheman, (7 Peters, 86,) says: “It may not be unworthy of remark, that it is very unusual, even in cases of conquest, for the conqueror to do more than displace the sovereign and assume dominion over the country. The modern usage of nations which has become law would be violated; that sense of justice and of right, which is acknowledged and felt by the whole civilized world, would be outraged, if private property should be generally- confiscated, and private rights annulled. The people change their allegiance; their relations to their sovereign are dissolved; but their relations to each other, and their rights of property, remain undisturbed.”
Another of America’s greatest publicists, Mr. Wheaton, says: “But, by the modern usage of nations, which has now acquired the force of law, temples of religion, public edifices devoted to civil purposes only, monuments of art, and repositories of science, are exempt from the general operations of war. Private property on land, is also exempt from confiscation, with the exception of such as may become booty in •special cases when taken from the enemy in the field or in ibeseiged towns, and of military contributions levied upon the inhabitants of the hostile territory. This exemption extends even *435 to an absolute and unqualified conquest of the enemies country." (Elements of International Law, page 421.)
In the ease before the Supreme Court of the United States, of Ware, adm'r. of Jones vs. Hylton, before recited, Chase, Justice, on this subject, said: “It is admitted that Virginia could not confiscate private debts without a violation of the modern law of nations; yet, if in fact she has done so, the law is obligatory on all the citizens of Virginia; and on her courts of justice; and, in my opinion, on all the courts of the United States. If Virginia, by such conduct, violated the law of nations, she was answerable to Great Britain, and such injury could only be redressed in the treaty of peace.” (1 Peters' Cond. Repts., 106.) PatteRSon, Justice, said: “It has been made a question, whether the confiscation of debts, which were contracted by individuals of different nations in time of peace, and remained due to individuals of the enemy in time of war, is authorized by the law of nations among civilized States? I shall not} however, controvert the position that, by the rigor of the law of nations, debts of the description just mentioned may be confiscated. This rule, by some, has been considered a relip of barbarism; it is certainly a hard one, and cannot continue, long among commercial nations; indeed, it ought not to have existed among any nation, and, perhaps, is generally exploded at the present day in Europe.” (1 Peters' Cond. Repts., 126.) At page 127, the same judge says: “The relation which the parties stood in to each other at the time of contracting these debts, ought not to pass without notice. The debts were contracted while the creditors and debtors were subjects of the same king, and children of the same family. They were made under the sanction of laws common to and binding on both. A revolution war could not, like other wars, be forseen or caR culated upon. The thing was improbable. No one, at the time that.the debts were contracted, had any idea of a severance or dismemberment of the empire, by which persons, who had been united under one system of civil polity, should be torn asunder and become enemies for a time, and perhapsaliens forever. Contracts, entered into in such a statte of things, ought to be sacredly regarded. Inviolability seems’ *436 to be attached to them.” Wilson, Justice, said: “When the United States declared their independence, they were bound to receive the law of nations in its modern state of purity and refinement. By every nation, whatever its form of government, the confiscation of debts has long been considered disreputable; and we know, that not a single confiscation of that kind stained the code of any of the European powers who were engaged in the war which our revolution produced.” (1 Peters’ Cond. Repts., 128.)
It is clear that, if the laws of nations did not tolerate the confiscation of private debts and private property, in the eigh- • teenth century, that, with nearly a century’s advance of commerce, civilization, and Christianity, the improvements and meliorations of the usages and customs of nations towaid each other, growing out of those benign influences, must render the barbarous rules of the past intolerable.
Neither the laws of nations, nor the laws and usages of war, as now recognized, authorize this general and universal confiscation of private property.
But, it may be said that neither the laws of nations, nor the usages of war, are obligatory on a sovereign, if he sees proper to prescribe another rule, and this may be true; yet, when our government attempts to prescribe a rule, such rule must be in subordination to the constitution, and, if \iolative of any con-stitututional provision, it is not a rule, but a nullity.
The property forfeited by this act of Congress is not, by the law of nations, prize; it is not booty, nor contraband of war. It is not forced military contribution, nor is it property used or employed in the war or in resistance to the laws. But it is private property, outside the conflict of arms, forfeited, not because it is the instrument of offense, but a§ a penalty for the crime of the owner.
But, if this were not so, the 3d section, 3d article United States constitution, by declaring in what treason shall consist, what shall be the requisite proofs, and the limitation on its punishment, has most effectually placed a limitation on the war power as to this crime. Treason can only be committed by levying war against the United States, or in adhering to their *437 enemies, giving them aid and comfort in time of war. Treason ’ can only be committed by persons owing allegiance, either absolute as citizens, or qualified as denizens.
In order to punish treason, the offender must be indicted, arraigned, convicted and adjudged guilty, and then, if sentenced to death; no other punishment can be inflicted; but, if the death ’ penalty is not prescribed, fine, imprisonment, and forfeiture for life, may be prescribed — but, to the war power, belongs no right of punishment for treason. No military court, no military tribunal, can, or dare attempt to punish for treason. The trial of this crime has been confided, by the constitution, to the civil courts of the country; the punishment is to be prescribed1 by the laws of the land, with'the limitation that no attainder shall work corruption of blood or forfeiture, except for the life of the person attainted.
It has been well said by Judge Thomas, a representative in Congress, and one of Massachusetts’ most accomplished lawyers, “that the powers of war are almost infinite. The resources of this vast country spring to the open hands of this government. All that men have, even to their lives, are at: the service of their country. The government can raise an 1 army of over seven hundred thousand men; can arm and! equip them with the best appliances of war; can cover the rivers and bays and seas with its navy; can blockade a coast of three thousand miles; and may cut down the last rebel on the field of battle. Such is the power of war. But when all these powers shall have been used, when peace shall have been restored, or when the rebels shall come and lay themselves at the feet of the government, or be taken captive by its armies, then, also, will this government be shown to be the most powerful and the noblest on the earth, not because the captured rebel is at its mercy, but because he is not. Because, under the shield of the constitution, the rebel at its feet is stronger than armies, stronger than navies. Tt cannot touch a hair, of his head, or take from him a dollar of his property--unti it shall hav,e tried and condemned him by the judgment of his peers and the laws of the land. Are these written constitutions established to give to-government power, without limit, *438 over the property, liberty, and life of the citizen, or, are they made to define and limit the power of the government, and to shield and protect the rights of the citizen?”
When this vast army, of three-fourths of a million of citizen soldiers, shall have accomplished its mission; when they shall be dispersed, sent to them homes, again to resume their domestic duties and the callings of civil life; when the constitution and laws of the United States shall again be administered through the agencies of its civil officers; when the citizens shall again apply to the civil courts for the redress of their grievances and the vindication of their rights; when honest, faithful,intelligent men, who have made the constitution and laws of their country the study of their lives, unstirred by passion and unbiassed by partiality, shall sit in the “judgment seats,” then may we hope to see the constitutions of the United States and of the respective States administered as the supreme law of the land; then may we hope lhat the citizen will be made to know that the acts of Congresses, and proclamations of Presidents, made without the authority of the constitution and in contravention thereof, are mere brutem ful-mens — nullities.
The infinite wisdom of the constitution is made the more manifest by the magnitude of this rebellion. For, when it shall have been subdued, and the majesty of the constitution and laws of the United States shall be acknowledged throughout its broad confines, and when it shall have exhausted the measure of punishment it may prescribe, within constitutional limits, on the guilty, there the punishment must cease. The constitution does not permit the calamity to be visited on the un-offending offspring, and many millions of these reduced to a state of absolute and unmitigated pauperism.
If it be said that Congress may prescribe a fine, and that such would operate as an absolute forfeiture pro tanto — to that extent, — it may be replied, that when Congress shall exercise this power, under the constitution, it will be the duty of courts to administer its enactments, unless these should conflict with article 8, amendments to the constitution, which provides, that “excessive bail shall not be required, nor excessive fines itn- *439 posed, nor'cruel and unusual punishments inflicted.” But the right to impose fines for crimes, limited only by said amendments, cannot authorize the exercise of an unlimited power of forfeiture forbidden by another clause of the constitution.
If the principles, herein announced, be correct, it follows» that the absolute forfeiture of the slaves, and freedom thereof of those convicted under the first and second sections of said’ act of Congress — although the conviction and judgment otherwise may be strictly in accordance with the constitution — is also unconstitutional and void, as being in conflict both with the constitution of the United States and of this State; for, whatever may be the embarrassments growing out of the repugnance of those who may administer the Federal government, to its holding slaves, or the use to which they may desire to dedicate them, in the exercise of the right and power of the government to forfeit for the life of the offender, on judgment of treason against him, yet this cannot confer on the government power forbidden by the constitution of the United States and violative of the State constitutions.
The principles intended to be illustrated in this opinion are briefly:
1. That the government of the United States is sovereign, supreme, and designed to be perpetual, but is a government of enumerated powers and specified grants, including such as are necessarily implied.
2. That the State governments, for all purposes not confided to the Federal government, are also sovereign, supreme, and designed tobe perpetual.
3. That these two governments are parts of one whole, and that the constitution and laws of the Federal government is part of each State government, and, viceversa., the constitution and laws of the respective States are parts of the Federal government, within such respective States.
4. That in a conflict as to supremacy, between the United States and a State, the States have agreed to abide the decision of the Supreme Coip-t of the United States.
5 That there is no constitutional mode by which a State and its citizens can withdraw from the Union, repudiate the *440 allegiance due the United States, and reject its authority," and that all such attempts violate both the Federal and State constitutions, and are revolutionary.
6. That on a restoration of the national authority over the seceded States, their constitution and laws, which existed and were recognized by the Federal government previous to the rebellion, become operative as part of the national government.
7. That the States cannot, constitutionally, by legislative, executive, or judicial action, destroy the United States government, nor can they constitutionally destroy it by force of arms Nor can the United States constitutionally destroy a State gov-; ernment by any or all of these means.
8. That the United States constitution confers ample powers on the government to enforce the observance of its laws, either peaceably, or by force if necessary, on the part of the States and the citizens of the States, but cannot make war on a State for any purpose of its destruction.
9. That the government of the United States is under constitutional obligation to protect each State against invasion, and domestic violence, and revolution, and every loyal citizen has a right to expect a faithful observance of this obligation.
10. That, as the constitution and laws.of the United States are supreme over the constitution and laws of a State, there can be no conflict; all laws, therefore, must be in conformity to the Federal constitution, and not in conflict with a State constitution, to be valid.
11. That both the Congress of the United States and Sla.te legislatures are prohibited from passing bills of attainder, and that none but judicial attainder is known to our constitutions, whether Federal or State.
12. That judicial attainder cairionly be had upon a criminal proceeding, and must be upon indictment, or other legal proceedings, with a trial and judgment as upon an indictment.
13. That treason against the United States can only be committed by actually levying war against them, or in adhering to their enemies, in time of war, giving them aid and comfort.
*441 14: That the trial and punishment for treason has been confided, by the constitution, to the courts of the country; the punishment to be prescribed by Congress, within constitutional limits. ■
15. That even upon judicial attainder, for treason, there can be no forfeiture of either real or personal estate, save for the life of the person attainted.
16. That the limitation on the power to punish for treason is a limitation on the war power, as to‘this crime.
17. That this act of Congress of 17th July, 1862, to suppress insurrection, &c., is in derogation of the personal rights, and rights of property, of the citizen as guaranteed both in the Federal and State constitutions.
, 18. That said act.is not in conformity with the Federal constitution, and is in conflict with the constitution and laws of the States, and derogatory to their sovereignty.
19. That said act cannot be justified by the laws of nations, nor by the usages of war as recognized by modern civilized and Christian nations.
20. That being in conflict with the United States constitution, it cannot be upheld as a rule prescribed by a sovereign, in derogation of the law¡s oí nations, but is a nullity.
Believing that the principles involved and the consequences growing out of them, more important than any heretofore be-before this court, it has seemed proper, to me, to array the authorities and reasons, of those great luminaries, which have preceded me, rather than attempt an original argument?' hoping also that it will be more conducive to the establishing of sound constitutional principles than could have been reasonably expected had the argument rested on my own humble authority. R. K. WILLIAMS.