JUDGE WILLIAMS
dissenting from the opinion of the majority of THE COURT, DELIVERED THE FOLLOWING SEPARATE AND DISSENTING opinion:
■ It is not alleged that Chas. W. Price was a citizen of Kentucky at the time Gen. Morgan, with his command, as a part of the Confederate army, invaded the State, nor that appellee was a citizen, nor that the taking was within the State; therefore, this cause cannot rest upon the sovereign right of the State to control her own citizens, and to take from them belligerent rights, when they shall engage in a war upon her. Belligerent rights aré derived from the laws and customs of nations; yet the sovereign may disregard these laws, so far as its own citizens are concerned, as was adjudicated by this court in Norris vs. Donophon, opinion by Judge Bullitt (4 Met., 391), in which the court said :
“ It must be conceded, however, that the courts of a sovereign engaged in war cannot compel him to observe the usage of nations, nor treat as void any act of his because it violates that usage. The law of nations has no obligatory force upon him in dealing with his subjects. He may disregard it, and establish a different rule; and if he does so, those within his jurisdiction must observe the rule so established, however it may conflict with the usage of nations. In the absence of any positive law to the contrary, the usage of nations may furnish a rule for the guidance of courts of justice; but they cannot be governed by it in the presence of a positive confiding law made by a sovereign who may choose to disregard itciting as authority United States vs. Perchemain (7 Peters, 86), Brown vs. United States (8 Cranch, 110).
In the late rebellion Kentucky adhered to the cause of the national government. A portion of her citizens set up *390 a hostile provisional State government, which adhered to the cause of the “ Confederate States,” consequently, all her citizens who adhered to, and engaged in the military service of either the provisional State or Confederate States government were waging war against her cause, and when within her territory, upon her, though they may have been at the same time prosecuting hostilities against the United States.
The rebellion having soon grown into a civil war, belligerent rights were superadded to those of municipal on the part of the national government, consequently, it indulged in much legislation in relation to the people of the seceded States, and many judicial decisions on these statutes have already been rendered by the United States courts.
The supreme court of the United States in the case of the Schooner Brilliante vs. United States (2 Black, 667), and other prize cases, as early as December, 1862, held that the rebellion became a civil war “ when the regular course of justice was interrupted so that the courts could not be kept open,” and “ that its actual existence is a fact in our domestic history, which the courts are bound to notice and to knowand that when “ civil war exists, hostilities may be prosecuted on the same footing as if those opposing the government were foreign enemies.”
And these belligerent rights pertain to both parties, and this in no manner depends on the recognition of its independence by the metropolitan country or foreign nations ; for “ the recognition of belligerent rights in a colony or portion of a State in revolt from, or in opposition to, the metropolis, is not to be confounded with the acknowledgment of the absolute independence of such province or colony. Thus, even before their own formal declaration of independence, France and Spain opened their ports to *391 the North American colonists, and treated them as an independent people.” (Annual Register, 1776, page 182; note 16, page 41, Lawrence Wheaton's International Law.
And in 1779, “the States-General, in reply to a demand of the British ambassador to deliver up prizes brought by Paul Jones into the Texel, declared that they would in no respect take upon themselves to judge of the legality or illegality of those who, on the open sea, take any vessel which do not belong to their country.” (Annual Register, 1779, page 249.)
“ An illustration of the claim of belligerent rights on the part of a colony engaged in vindicating its independence in the mother country, is to be found in the reclamations persistently maintained by the United Statesr against Denmark, from 1779 almost to the present time, on account of three prizes captured during the war of the American Revolution by the squadron under Paul Jones, and carried into a port of Norway, then under the government of Denmark, by whom they were delivered up to England.” (Sparks' Diplomatic Cor., vol. 3, p. 120; Sparks’ Life of Franklin, vol. 8, pp. 407, 425, 433, 462; State Papers, vol. 3, p. 4; Ex. Doc., H. R., 1 Sess. 28 Cong., vol. 6, No. 264.)
“ During the existence of the civil war between Spain and her colonies, and previous to the acknowledgment of the independence of the latter by the United States, the colonies were deemed by them belligerent nations, and entitled to all the sovereign rights of war against their enemies.” (United States vs. Palmer, 3 Wheat., 610; The Devena Pastora, 4 Wheat., 52; The Santissima Trinidad, 7 Wheat., 337.)
In the revolt of Greece against Turkey, “ to a complaint of the Porte (to Great Britain) against allowing the Greeks belligerent rights, Mr. Secretary Canning replied *392 that the character of belligerency was not so much a principle as a fact; that a certain degree of force and consistency acquired by a mass of population engaged in a war entitled that population to be treated as a belligerent.” (Lord J. Russell’s Speech, House of Commons, May 6, 1861; Law. Wheat., 43.)
As early as April, 1861, France and England determined to recognize the Confederacy as a belligerent power, and declared neutrality as between the contending powers. (Papers Relating to Foreign Affairs, 209.) The other powers of Europe recognizing the war and belligerent character of both parties, adopted the principle of neutrality during the contest.
Early in the war the government itseif recognized the Confederacy as a belligerent power, and this secured to its armies the belligerent rights of war as recognized by usage of nations, except so far as controlled by the positive enactments of Congress or the State Legislature.
As the Confederate armies were unquestionably entitled to belligerent rights by the laws of nations, the recognition of the great powers of Europe and of the metropolitan government as a belligerent, it may well be inquired what those rights and powers are relative to capture of property, &c.
Mr. Wheaton in his text says : “ From the moment one State is at war with another it has, on general principles, a right to seize on all enemies’ property, of whatsoever kind and wheresoever found, and to appropriate the property thus taken to its own use, or to that of the captors. * * * * * * * *
“ But, by the modern usage of nations, which has now acquired the force of law, temples of religion, public edifices devoted to civil purposes only, monuments of art, and repositories of science, are exempt from the general *393 operations of war. Private property on land is also exempt from confiscation, with the exception of such as may become booty in special cases, when taken from the enemy in the field or in besieged towns, and of military contributions levied upon the inhabitants of hostile territory.” (Lawrence Wheaton, 596.)
Then, whether it be regarded as booty taken in the field, or military contribution or impressment, because, then having possession of the country, there can be but little doubt that taking houses for the use of the army from the people of hostile territory comes within the purview of belligerent rights, however unjustifiable the indiscriminate taking of private property for the private use of the captors might be.
Mr. Upton, in his work upon Maritime Warfare and Prize, page 160, written since the late rebellion began, quotes, as approved authority, from Grotius, as follows: “ Hence as from this source originate all the rights which war gives us over things belonging to the enemy, we may have a right to deprive him of his possessions — of everything which may augment his strength and enable him to make war. Phis every one endeavors to accomplish in the manner most suitable to him. Whenever we have an opportunity, we seize on the enemy’s property and convert it to our own use, and thus, besides diminishing the enemy’s power, we augment our own, and obtain at least a partial indemnification or equivalent, either for what constitutes the subject of the war, or for the expenses and losses incurred in its prosecution — in a word, we do ourselves justice.” And at pages 162-3 he quotes, with approval, from a lecture of Parsons, Dane Professor of Law in Harvard University, on the subject of the legal rights as to slaves. Of the Union armies advancing into the rebellious States he says :
*394 “ In the first place, that army must have the rights, and all the rights, of war. * * * There are four ways in which that army might deal with slaves. ■ One is to seize and use them in its military labors. That they might do this seems to me as certain as that they might seize horses or oxen to draw their wagons, or shovels to dig their trenches. * * * It is a common opinion that civilization has so far mitigated war that it is no longer one of the laws of war that an invading army may seize, use, or destroy private property. This is a mistake, according to all the authorities on the law of nations. It is undoubtedly true, however, that the modern usages and proprieties of war — and there are such things — would justify the exercise of this right only on the ground of military necessity;” and in speaking of another way, he says: “ It would, regarded as a mere question of law, stand on the footing of a destruction of private property in an enemy’s country; and like that, it would* be an unquestionable right; but, if the usages of war were to govern it, it would be a right to be exercised only as a military necessity, and for the purpose of weakening the enemy and lessening his means of attack or resistance. And the existence of this necessity must be determined by the commanding officer, or by the supreme authority at home, in view of all the circumstances of the case.” (Upton’s Maritime War, 162-3.)
These authorities establish, as a part of the sovereign rights of war, belonging to all belligerents, the right to take private property in an enemy’s country to lessen the •power of their adversary, or to increase their own, as a military necessity, of which the officer in command is to be the judge, unless controlled by the supreme power at home. But these belligerent rights are subject to modifications by the positive rules enacted by the sovereign’ *395 power which all the citizens and courts of such sovereign must observe.
The States being the original sovereigns, were invested with the most absolute and perfect sovereign powers belonging to the most independent and exalted nations of the earth; and these powers are yet retained, except only so far as delegated by the United States Constitution, or therein prohibited to the States.
The sovereign right and power to protect their own-government and people against invasion and domestic violence, so far from being either delegated or prohibited, is expressly recognized by the United States Constitution. In article 1, section 2, subsection 2, it is provided, that no-State, without the consent of Congress, shall “ engage in war unless actually invaded, or in such imminent danger as will not admit of^ delay.”
In case of invasion, or when the danger is so imminent as not to admit of delay, the State may engage in war without the consent of Congress, and by its consent may so engage in any case. This is not a prohibition, but a qualification of sovereign power of war.
Not being satisfied, however, with these provisions, the States, in their extreme jealousy of this most essential perpetuating power, by amendment in article 2, have incorporated into the national Constitution that “ a well-regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed.” Nor are we without judicial authority on this subject. In what is known as the Dorr rebellion in Rhode Island, in 1842, which was a conflict as to the supremacy of the State government, which had existed from the time of Charles the Second, and a new State government set up by a majority of the male citizens over twenty-one years old, residents of the State, but *396 which had not been authorized by any enactment, the legitimate State government proclaimed martial law, and under its authority, and by direction of the officer in command, Luther’s dwelling was forcibly entered and searched; and for this he brought a suit in the United States court against Borden, he having in the meantime became a citizen of another State. This case went to the supreme court of the United States (7 How., 1), in which the court, by Chief Justice Taney, said: “ Unquestionably a State may use its military power to put down an armed insurrection too strong to be controlled by the civil authorities. The power is essential to the existence of every government, essential to the preservation of order and free institutions, and is as necessary to the States of this Union as to any other government. The State itself must determine what degree of force the crisis demands. And if the government of Rhode Island deemed the armed opposition so formidable and so ramified as to require the use of its military force and the declaration of martial law, we see no grounds upon which this court can question its authority. It was a state of war; and the established government resorted to the rights and usages of war to maintain itself, and to overcome unlawful opposition.”
And in 5 Wheaton, 45, Justice Story said: “Why may not a State call forth its own militia in aid of the United States to execute the laws of the Union, or suppress insurrection or repel invasion? It would certainly seem fit that a State might do so, where the insurrection or invasion was within its own territory, and directed against its own existence or authority.” And this is referred to by the court as an instance wherein the same kind of power is in both national and State governments, as essential to the existence of each.
*397 ■ This certainly recognizes still in the States all the sovereign rights of war for defensive purposes; and this recognition by the national Constitution and supreme court of the United States is not all.
But we find in our State Constitution many clauses predicated on this sovereign right of war. Section 8, article 3, relative to the Governor, says: “He shall be commander-in-chief of the army and navy of this Commonwealth and of the militia thereof, except when they shall be called into the service of the United States.” And article 7 is devoted wholly to the militia of the State. And in section 35, article 2, it is provided, “ that the State may contract debts to repel invasion, suppress insurrection, or, if hostilities are threatened, provide for the public defense.” And section 5, article 8, an appropriation of money to support an army shall not be made for more than two years.
Thus the people, in their sovereign capacity, still recognizes'in their State, as never having been surrendered, the right to have an army and nav3r; a commander-in-chief of both; to raise money and contract debts to repel invasion and suppress insurrection, and to provide for the public defense against threatened hostilities; and, for1 defensive purposes, these are commensurate with the most absolute war powers invested in any government, people, or nation.
In the late rebellion, Kentucky not only had a domestic insurrection and threatened hostilities, but was actually invaded by hostile forces. Besides, she not only had the sanction, but the positive command of both the Congress and President of the United States to engage in the war; which, so far as her citizens were concerned, within her tenitory and jurisdiction, left her with the most unbounded right and sovereign power to control, by positive en *398 aetment, these belligerent rights recognized by the usages of nations; and her courts should administer her laws.
The State never having surrendered her sovereign war power to resist invasion and suppress domestic insurrection and provide for the public defense against threatened hostilities, her right to control her own citizens whilst within her territory and under her jurisdiction cannot be humbled, degraded, and destroyed by the usages and customs of foreign nations. This would be a surrender of State sovereignty and State rights wholly unwarranted by American judicature, either of the State or United States courts, incompatible with the genius of both Constitutions, and inconsistent with the practice of either the United States or the Confederate States governments; for it is a well-known historical fact that the latter declared war against the free States of the United States,' and not against it.
But in all else, the States having surrendered to the national government the war-making power, its acts are binding on them; and it having recognized the Confederates as belligerents, and thereby granted to them the protection of the laws of nations, except so far only as modified by its positive enactments, the State could not take these rights from those who owed her no allegiance, and were under no obligation to observe her laws; or, in other words, her laws, in derogation of belligerent rights, could only be enforceable against her citizens.
Therefore, whatever may have been the legislative intention in the enactment of February 22, 1864 (Myers' Supplement to the Statutes, 1), there can be no doubt but that the operation of this statute must be confined to those who were citizens at the time of the act complained of, owing allegiance to the State, and bound to observe her laws, and who may have perpetrated the *399 act within her jurisdiction, and thereby trespassed upon her citizen.
Hence it is most essential, under this statute, that these indispensable facts should be averred and proved; for, in their absence, neither an issue thereon nor confession could be taken, and proof was wholly irrelevant, and therefore the judgment should be reversed.
By the first section of said act it is provided “ that if any soldier or body of soldiers, or armed band belonging to, engaged for, acting in the interest of, or professing to be in the interest of, the so called Confederate States of America, or provisional government of Kentucky, shall injure or destroy, or take or carry away, any property of any person, he shall be entitled to recover double the value thereof in damages of any of the persons doing any of said wrongful acts.”
But as a majority of this court, in Burckett vs. McCarty, MSS. of Summer Term, 1866, held the act of March 11, 1862 (Myers’ Supplement, 86), known as the expatriation act, as unconstitutional — although that was in the case of a citizen who had never been in the army- — yet the scope and reasoning of the court embraces those who had voluntarily gone into the southern army, and had taken the oath of allegiance to the Confederate States and provisional State governments. And although I deemed said act as both constitutional and humane, as it released the southern soldiers who had gone from Kentucky from their allegiance to the State, by regarding such acts as a voluntary expatriation by the consent of the State, yet, with all good citizens, I am bound to receive the decisions of this court, even when contrary to my own convictions, as the law of the land; and as, without the aid of this statute, no act of the State can be found consenting to the expatriation of those citizens *400 of hers who so engaged in the rebellion, or a release from their obligations of allegiance; and as, on a return of the cause, the plaintiff may be enabled to so amend his petition as to bring the case fully within the legal operation of the statute of February 22, 1864, the plaintiff should have a reasonable time to amend.
I do not concur with the announcement that the State could no more control the conduct of her own citizens as to the exercise of belligerent rights than she could the conduct of citizens of other States. With all due deference to the opinion of my colleagues, I regard this announcement as wholly unsustained by constitutional sanction, political philosophy, or judicial authority.
It is scarcely necessary for me to repeat what this court said in Norris vs. Donaphan. And the supreme court of the United States has frequently said that the power “ to declare war,” found in the Wth clause of section 8, article 1, United States Constitution, means a war with a foreign nation, and has no reference to a domestic war or rebellion. The power to prosecute a war to “ execute the laws of the Union, suppress insurrection, and repel invasion,” is found in the 15th clause of the same section.
For these reasons I concur in the reversal, but not in the direction for an absolute dismissal of the plaintiff’s petition.