CASE 95—PETITION ORDINARY—NOVEMBER 26.

# Terrill vs. Rankin.

**APPEAL FROM HENDERSON CIRCUIT COURT.**

1. Unless the order of the superior officer was authorized by the laws of war, it conferred no legal authority, and, consequently, the act of taking money by force out of the bank in Hopkinsville, Kentucky, in December, 1864, by a Confederate quarter-master, acting under the order of his commanding general, was illegal, and he is personally responsible for all the consequences of his own unjustifiable and tortious act.

2. "Private property on land is also exempt from confiscation, with the exception of such as may become booty in special cases, when taken from enemies in the field or in besieged towns, and of military contributions levied upon the inhabitants of the hostile territory." "The general rule derived from national law is, that no use of force against an enemy is lawful unless it is necessary to accomplish the purposes of war. The custom of civilized nations founded upon this principle has therefore exempted the persons of the sovereign and his family, the members of the government, women and children, cultivators of the earth, artisans, laborers, merchants, men of science and letters, and generally all other public or private individuals in the ordinary civil pursuits of life, from the *direct effect* of military *operations*, unless actually taken in arms, or guilty of some misconduct in violation of the usages of war by which they lose their immunity." (*Lawrence's Wheaton, page* 596.)

3. As the conflicting parties had equal belligerent rights, the Federal enactment of 1862, authorizing the taking of all sorts of property in the revolting States, might perhaps have authorized a retaliatory act by the Confederate government. But no such act has been pleaded, or is judicially known by the court; and without some such authority the Confederate general had no right to order the assault on the bank, and the seizure of the money of a non-combatant citizen, in violation of the international laws of war.

4. The Confederate government and its officers. and soldiers are estopped from asserting or exercising any belligerent act against the property

of peaceable citizens of Kentucky. The Confederacy had assumed that Kentucky was one of her sisterhood, and had organized a provisional government for her; claimed political sovereignty over her; had elected a Governor for her, and drew from her bosom as a Confederate State a full representation in her Congress. Confederate officers, &c., are thus precluded from calling the peaceable citizens of Kentucky enemies, or treating their property as enemies' property; and this estoppel prevents the defendant from pleading that he took the property of an enemy, and had the belligerent right to do so.

5.   The act of February 28, 1867 (An act to quiet all disturbances growing out of the late rebellion), is unconstitutional in so far as it affects or was intended to affect *civil remedies for private wrongs.*

CHARLES EAVES and J. F. BULLITT,                For Appellant,
                CITED—

*Lawrence's Wheaton, pp.* 596, 595.

*Halleck's International Law,* 456–7, 348, *sec.* 31.

*Burlamaqui, b.* 2, *ch.* 3, *secs.* 18, 19.

13 *Howard,* 115 ; *Mitchell vs. Harmony.*

*Act of Feb.* 28, 1867, *and Feb.* 22, 1863, *Myers' S.,* 1.

3 *Dallas,* 386 ; *Calder et ux. vs. Bull et ux.*

2 *Dallas,* 304 ; *Vanhorn vs. Dorrance.*

8 *Co.,* 118 ; *Doctor Benham's case.*

*Hob.,* 87 ; *Day vs. Savage.*

12 *Mod.,* 687 ; *City of London vs. Wood.*

1 *Bay,* 252 (*S. C.*) ; *Bowman vs. Middleton.*

17 *Johnson,* 195 ; *People vs. Platt.*

7 *Johnson,* 477 ; *Dash vs. Vankleck.*

1 *Bay,* 179 ; *Osburn vs. Huger.*

2 *Cranch,* 272 ; *Ogden vs. Blackledge.*

4 *Serg. & R.,* 401 ; *Bedford vs. Shilling.*

12 *Serg. & R.,* 362–72 ; *Eskin vs. Raub.*

2 *Gallison,* 105 ; *Society vs. Wheeler.*

8 *Wheaton,* 493 ; *Society, &c., vs. New Haven.*

1 *New Hampshire Rep.,* 199 ; *Merrill vs. Sherburn.*

1 *Aikin,* 121 ; *Ward vs. Barnard.*

2 *Greenleaf,* 28 ; *Brunswick vs. Litchfield.*

---

Terrill vs. Rankin.

---

2 *Greenleaf*, 275 ; *Proprietors vs. Ken. Pur.*

2 *Peters' U. S. Rep.*, 657–8 ; *Wilkinson vs. Leland.*

1 *Blackford*, 220 ; *Lewis vs. Breckinridge.*

*Zenophon's Cyropedia, Lib.* 5.

1 *Bay*, 15 ; *Whitaker vs. English.*

*Maule & Selwyn*, 92 ; *Wolf vs. Oxholm.*

8 *Cranch*, 110 ; *Brown vs. United States.*

4 *Metcalfe*, 391, *and cases cited* ; *Norris vs. Doniphan.*

*Sedgwick*, 514, *and cases cited, and* 526.

2 *Duvall*, 188 ; *Hughes vs. Todd.*

2 *Duvall*, 193 ; *Corbin vs. Marsh.*

3 *Howard's Miss. Rep.*, 240.

2 *Brightly's Digest, p.* 1237, *sec.* 43.

9 *Ben. Mon.*, 295; *Gains vs. Gains.*

L. W. POWELL, J. H. POWELL, and L. W.
     TRAFTON,                               For Appellee,
                        CITED—

*Act of Feb.* 22, 1864 ; *Sess. Acts* 1863–4, *p.* 120.

1 *Duvall*, 234 ; *Bland vs. Adams Express Co.*

2 *Black, U. S. Prize Cases, page* 667.

*Wheaton's Int. Law, part* 4, *chap.* 2, *sec.* 5, *page* 395.

*Ib., pp.* 671, 674, *and part* 1, *sec.* 7, *p.* 58.

*Halleck's Int. Law, part* 4, *ch.* 2, *sec.* 11, *p.* 408 ; *sec.*
     17, *p.* 460.

*Vattell's Law of Nations, book* 3, *secs.* 161, 173, 195.

*Ib., secs.* 295, 294, 293.

1 *Duvall*, 182 ; *Commonwealth vs. Holland.*

13 *Howard*, 137 ; *Mitchell vs. Harmony.*

*Constitution U. S., art.* 1, *secs.* 3, 7; *art.* 1, *sec.* 10, *art.* 6.

*Wharton's Criminal Law, secs.* 169, 170.

*Story on Contracts, secs.* 1163, 1165, 1836–7–8.

1 *Dana*, 509–12 ; *Gains vs. Buford.*

1 *Dallas*, 117 ; *Republica vs. DeLongchamps.*

1 *Dallas*, 362; *Republica vs. Sparhawk.*

2 *Binn.*, 581 ; *Wilcocks, &c., vs. Union Ins. Co.*
2 *Bay's ( S. C.) Rep. ; Wade vs. Barnwell.*

JUDGE ROBERTSON DELIVERED THE OPINION OF THE COURT:

In December, 1864, during the prevalence of the late civil war, and while General Lyon, of the Confederate army, was in the military occupation of the town of Hopkinsville, Kentucky, he issued the following order, dated Hopkinsville, Kentucky, December, 1864 :

" Lieut. J. E. Rankin, acting Chf. Q. M. Dept. Western Ky., will at once proceed to the bank in this place, open the vaults, safes, &c., and take possession of· all money of every description found therein.   He will retain possession of same until further orders.

" By order of Brig.ˈGen. Lyon.

"W. D. McKay, Capt. and A. A. A."

In executing that order, Rankin, the appellee in this case, forcibly abstracted, with other moneys, five thousand four hundred and eleven dollars specially deposited therein by the appellant.

For that act,·charged as wrongful, the appellant, on the 25th of August, 1865, brought this action, which the appellée answered by pleading the said order, alleging that the appellant was, as a citizen and·resident of Kentucky, an enemy of the Confederacy then recognized as a belligerent, and that "he, appellee, disposed of the money as ordered to do by General Lyon, his superior officer, not ˈappropriating one cent of said money to his own use."

The circuit court overruled a demurrer to that answer, and thereupon dismissed the action.

That judgment this court cannot affirm.

As adjudged in·*Mitchell vs. Harmony* (13 *Peters*), and in the yet unreported case of *Christian County vs. Rankin,*

*&c.*, by this court, unless the order was authorized by the laws of war, it conferred on the appellee no legal authority, and, consequently, his act was illegal, and he is personally responsible in this action for all the consequences of his own unjustifiable and tortious act.

If the act as charged and admitted should be acknowledged to have been colorably belligerent, the answer fails to show that it was a legal exercise of belligerent right; and for this conclusion we will suggest three reasons:

1. To justify as lawful the exercise of belligerent right, General Lyon must have ordered the act complained of for the use of his *de facto* government, and appropriated the money to its use. But admitting, as the demurrer did, all the facts stated in the answer, nevertheless it may be true, and, from the guarded manner in which the disposition of the money is vaguely asserted, may be not improbable, that the money, as in many similar cases, was taken and appropriated to private use, which would make the spoliation robbery, without any semblance of either legal or moral excuse. On this ground alone, therefore, had there been no other, the demurrer to the answer ought to have been sustained.

2. But, even if the money were taken and used for the Confederacy, we cannot admit that any belligerent right justified such an act.

The wisdom and magnanimity of this wonderfully progressive era have made no greater progress than in the usages of war; and now, in this Christian age of civilization and amelioration, we presume that no civilized nation would sanction as a rightful exercise of belligerent power rifling a bank and seizing the private money of non-combatant citizens. We neither know nor have heard of any such sustained example among such nations for many years.

The example of the Russian General Diebitsch, when he crossed the Balkin and entered Romelia with his invading army, and of the American Generals Taylor and Scott, in their invasion of Mexico, should be recognized as illustrations of the true law of international warfare; and we know no subsequent authority or precedent against it in any international war between Christian nations. General Diebitsch assured Musselmen, and Generals Taylor and Scott assured Mexicans, of exemption from spoliation of their private property; *and these pledges were fulfilled.*

The right to impress property for necessary and immediate military use, or levy contributions of articles of subsistence, is still admitted to be a belligerent right; but the exercise of that right is subject to conservative limitations; and the act done in this case does not come within the reason or the range of that right as yet practiced or recognized by civilized nations. In our late civil war, sectional and personal passions too much ruled the antagonist parties, and, as in all such strifes, prompted many illegal acts of rapacity and proscription on both sides. But vindictive passion cannot ever excuse, nor the plea of retaliation always justify, a violation of the law of international war, which is the law of civil war also.

In *Lawrence's Wheaton, page* 596, the author says: "Private property on land is also exempt from confiscation, with the exception of such as may become booty in special cases, when taken from enemies in the field or in besieged towns, and of military contributions levied upon the inhabitants of the hostile territory."

"The general rule derived from national law is, that no use of force against an enemy is lawful unless it is necessary to accomplish the purposes of war. The custom of

Terrill vs. Rankin.

civilized nations founded upon this principle has, there-
fore, exempted the persons of the sovereign and his fam-
ily, the members of the civil government, women and
children, cultivators of the earth, artisans, laborers, mer-
chants, men of science and letters, and generally all
other public or private individuals in the ordinary civil
pursuits of life, from the *direct effect* of military *operations*,
unless actually taken in arms or guilty of some miscon-
duct in violation of the usages of war by which they
lose their *immunity*."

The immunity of property, as well as of person, is here
evidently intended.

*Halleck* also, in his international law, page 456, says:
"Private property on land is now, as a general rule of
war, exempt from seizure or confiscation."

This rule has been asserted by our own government,
and the recognition of it claimed of European govern-
ments for half a century.  And the modern course of
these nations implies its general recognition.  It was so
adjudged by the court of King's Bench in England, in
the case of *Wolf vs. Oxholm,* 6 *Maule & Selwyn,* 92, in
which the court adjudged that the confiscation of British
debts by Denmark was void, as unauthorized ·by the
modern law of nations.  The same principle was recog-
nized by the supreme court of the United States in
*Brown vs. the United States* (8 *Cranch,* 110); and by this
court in *Norris vs. Doniphan* (4 *Met.,* 391).  And if it be
illegal to take uncertain representatives of money, the
unlawfulness of taking money itself is still more fla-
grant.

While, therefore, the emergencies of war may justify
the taking of such property as horses for military use,
subject to the obligation to pay the value, we can see
neither reason nor authority justifying the seizure of

money, by a forced loan or otherwise, than for enforcing a general contribution levied according to the usages of war.

As the conflicting parties had equal belligerent rights, the Federal enactment of 1862 authorizing the taking of all sorts of property in the revolting States might, perhaps, have authorized a retaliatory act by the Confederate government. But no such act has been pleaded, or is judicially known by this court. And without some such authority, General Lyon had no right to order the assault on the bank, and the seizure of the appellant's money, in violation of the international laws of war.

3. But the Confederate government and its army of officers and soldiers are estopped from asserting or exercising any belligerent act against the property of such peaceable citizens of Kentucky as the appellant is admitted to have been when his money was taken. The Confederacy had assumed that Kentucky was one of her sisterhood, had organized a provisional government for her, claimed political sovereignty over her, had elected a Governor for her, and drew from her bosom as a Confederate State a full representation in her Congress. And this representative mockery and pseudo sovereignty were never abandoned until the close of the war. And, consequently, as said by this court in the case of *Baker vs. Wright, &c.*, the Confederate authorities thus claiming the appellant, and all others like him in Kentucky, as Confederate citizens and friends, engaged to protect them and guard their property, and precluded themselves from calling them enemies or treating their property as enemies' property.

This estoppel prevents the appellee from pleading that he took the property of an enemy and had the belligerent right to do so.

Terrill vs. Rankin.

Nevertheless, Kentucky continued a State in the Union, in fact and in law, and, as such State, was faithful and true to the last; and, *de jure*, the appellant was *her* citizen, entitled to the protection of *her* arms and her laws. According to the pleadings, he has, therefore, a right to maintain this action for adequate damages, unless Kentucky's amnesty statute of February, 1867, shall be held to be law in his case.

The magnanimity of the motive that prompted that generous enactment is both characteristic and commendable.

But whatever may be the policy of the enactment, of which we have no judicial right to judge, we are clearly of the opinion that the Legislature had no constitutional power to make it (*for divesting private rights*) the law of the land, over which the Constitution, which it *so far* violates, is the supreme law. And of this it is our official *duty* to judge as a court established for maintaining the Constitution inviolate more than for any other purpose. And this sacred duty we must, as faithful sentinels of the people's guaranteed rights, honestly discharge, however unwelcome may be the inevitable task.

When that benevolent statute was enacted the appellant had a vested legal right to recover the money of which he had been robbed, and this action for that purpose was pending in this court. Can any constitutional jurist doubt that the Legislature had no power to divest that vested right without indemnifying the owner? That chose in action is "*property*," and very valuable property, and is therefore guaranteed by that great *palladium* of private property provided by the fundamental law of Kentucky—"*nor shall* ANY MAN'S PROPERTY *bé takcn or applied to public use without just compensation bcing* PREVIOUSLY MADE."

Terrill vs. Rankin.

The statute neither provided nor contemplated any such compensation. And if the statute be enforced in this case, the appellant's property will thereby be taken. from him for a supposed public benefit, without any compensation either paid or assured to him. While the Constitution lives and reigns, and the judiciary shall be able to uphold it, this can never be. The conclusive logic of this simple statement of the case needs no further argument. Metaphysical elaboration could not clarify, but might only obscure the meridian sunshine.

Our conclusion does not extend beyond civil remedies for private wrongs. And not doubting that conclusion, we adjudge that the circuit court erred in its judgment.

Wherefore, the judgment of the circuit court in this case is reversed, and the cause remanded, with instructions to sustain the appellant's demurrer to the appellee's answer, and for further proceedings consistent with the foregoing opinion.