Sneed, J.,
delivered the opinion of the Court.
This action was upon a promissory note, executed by the defendant to the plaintiff, in Fulton county, Kentucky, on the 25th of February, 1862, and pay *721 able on the 1st day of January thereafter, with eight per cent, interest from date. The note, — being given for the contract price of property sold by the plaintiff to the defendant, and not upon a consideration of forbearance, or upon a loan, — was valid by the laws of Kentucky. 2 Stant. Rev., ch. 63, § 2; Tousy v. Robinson, 1 Metc., 663.
The only defense seriously insisted upon here is, that the contract was in violation of the Laws of War and the non-intercourse Acts in force during the late Civil War, and therefore void. At the time of the contract the domicil of the plaintiff, Alexander, was in Eulton county, Kentucky, where the contract was made; and the defendant was a planter in Mississippi, but was then an A. Q,. M. in the military service of the Confederate States. The defendant bought of the plaintiff a lot of bacon, and some mules; and the note in controversy was in part payment for the contract price. The purchase was made on the private account of the defendant; and the property so purchased was by him transported to his plantation in the State of Mississippi, and used accordingly. The county of Fulton, Kentucky, is a border county, adjoining the Northern boundary line of West Tennessee: and that portion of Kentucky, and the whole of West Tennessee and Mississippi, were, at the time of the transaction, held in military occupation by the Armies of the Confederate States. The Act of Congress of the 13th of July, 1861, authorized the President to declare any State to be in revolution against the United States: and thereupon all commercial intercourse by and between the *722 same and the citizens thereof, and the citizens of the rest of the United States,' was required to cease, and declared unlawful so long as such condition of hostility should continue. The President accordingly proclaimed, on the 16th of Augnst thereafter, that the States of Mississippi, Tennessee, and other States, not including the State of Kentucky, were in revolution; and all commercial intercourse was declared to be unlawful between the inhabitants thereof and the citizens of the other States.
It is insisted on behalf of the defendant, that by force of this proclamation the transaction in controversy was unlawful, notwithstanding the belligerent occupation by the Confederates of the domicil of both parties and the whole territory intervening. We do not agree with the defendant’s counsel. The legislation of Congress and the proclamation of the President were but declaratory of the principles of the Laws of War, accepted and approved universally among civilized nations. They were supererogatory, and the Laws of War would have existed without them as well as with them. They did not alter, but only recognized these principles of Lnternational Law as applicable to the Civil War then flagrant between the States. It is said there is not an elementary writer who suggests a different doctrine than that trading among enemies in a state of war, without special government license, is unlawful; and that contracts entered into are absolutely void. In some of the earlier rulings in the English Courts it is held an indictable offense. Thus trading with, Scotland, in 13 Edw. II., though with *723 a license from tlie Guardians or Keepers of the Truce, was held an offense. 16 Vin. Ab., 599. And in King William’s time it was held a misdemeanor. at Common Law to carry corn to the enemy in time of war. 1 Term R., 85. There can be no doubt, say the standard authors, that from the nature of war itself all commercial intercourse ceases between enemies. It is forbidden by the mere operation of the Laws of War. 15 Johns, 63. “In a state of war,” said Johnson, J., in the case of the Rapid, “Nation is known to Nation only by its armed exterior: each threatening the other with conquest or annihilation. The individuals who compose the belligerent States exist as to each other, in a state of utter occlusion. If they meet, it is only in combat.” 8 Cr., 155. “ The ground,” said Story, J., in the same case, “upon which a trading with the enemy is prohibited, is not the criminal intentions of the parties engaged in it, or the direct and immediate injury to the State. The principle is extracted from a more enlarged policy which looks to the general interest of the Nation, which may be sacrified under the temptation of unlimited intercourse, or sold by the cupidity of corrupt avarice.”
This principle was applied in all its rigor to the late Civil War in this country. The two adversaries were States and Commonwealths — each claiming to be sovereign in its own sphere — aggregated on either side into Belligerent Nationalities. They were Belligerents in Fact and Belligerents in Law — and the Laws of War guaranteed to them all the rights of Belligerents— whether those rights were conceded or not to the *724 seceded States. The question of their enjoyment was a question to be determined by the logic of the bullet and the bayonet. But the War was a peculiar one. It was not a War to overturn the Republican System. It was not such a War as that of “The Two Roses,” when the rival Houses of York and Lancaster each claimed for itself the dominion of the British Empire— nor like other civil wars in England — nor yet such a War as the Colonies waged successfully against Great Britain, where the very form of the Old Government was prostrated and destroyed. But it was a War "where one-half of the Republic claimed the right to govern itself within its own territory upon the same principles of the Old Government and according to the traditions of the Fathers as they understood them. ‘The State of Kentucky was not among the seceded States. Her people were divided in sentiment upon the issue of dis-union. But she was a Southern State: was represented in the Southern Congress during the whole period of the War: — and was claimed by the-Confederacy. 2 Bush, 453; 3 Id., 202; 6 Id. 606. She furnished large armies to the South: — having like institutions at least as debatable: — and the Confederate States, while they menaced and coveted no permanent conquest of any territory North of the Ohio and Potomac, yet struggled to retain the State of Kentucky in her ancient status, as a Southern State. The government of the Federal Union on the other hand, in deference to the union sentiment of a large body of her citizens, excepted Kentucky from the operation of the non-intercourse Laws. Thus the State was left to *725 the chances of war: and under the well-established Laws of War — which were not intended to be abrogated by the Act of Congress, and could not be changed by the proclamation of the President— the allegiance of her people was due to that Belligerent Avhich for the time being encompassed them. This belligerent occupation imports an established possession of the Country — so that the conquering or occupying Power can execute its will either by force or by the acquiescence of the people for an indefinite time, subject only to the fluctuations and chances of war. It also implies that war continues; and that the occupying Power has not become the permanent Civil Government of the Country. In such a case, say all the authorities: “The people owe their allegiance to the occupying Power.” Thus it is said: “As the State has not been able to protect its citizens, its claims upon their allegiance is suspended during the hostile occupation. They, not only, can not be afterwards punished for having acquiesced in the authority that has gained control over the place, but they can not be compelled, to pay to their Government, after restoration, taxes, or excise, or custom duties, for the time the place was in the enemy’s possession.” United States v. Rice, 4 Wheat., 244; Fleming v. Page, 9 How., 663; Cross v. Harrison, 16 How., 164; Wheat. Inter. Law, 436. We hold that this principle of the Laws of War applied in full force to the locus of this contract with or without the concession of belligerent rights to the Confederate States. It was a belligerent occupation in the sense of the Laws of War: and pending such *726 military occupation, the allegiance of the plaintiff and the defendant were due to the Confederacy. In the case of the United States v. Hayward, when the question arose as to the effect of the British conquest and occupation of Castine, a place within the territory of the United States, it was held that by the conquest and occupation of Castine by the enemy, that territory passed under the temporary allegiance and sovereignty of the enemy: and of course the sovereignty of the-United States was, during the same period, suspended and the laws of the United States could no longer be enforced there. Castine, during such occupation,, was not a port of the United States with reference-to the “non-importation Acts.” . Therefore the bringing of British goods from Halifax to Castine during the-occupation, was not an offense against those Acts. 2 Gall., 485. And such we understand to be the uniform and unvarying doctrine of the Law of Nations,. as applicable to like cases. In this view it is not necessary to notice certain alleged technical errors of law, as the merits are clearly with the plaintiff.
Let the judgment be affirmed.